# H. O. McKNIGHT v. MANUF. N. GAS CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS
OF WASHINGTON COUNTY.

Argued October 19, 1891—Decided January 4, 1892.

[To be reported.]

1. A leasehold, operated for oil production, imposes on the lessee, after
   ascertaining the existence of oil, the duty of sinking so many wells as
   may be reasonably necessary, in view of operations on adjoining lands,
   to secure so much of the oil from the land demised as may be obtained
   with profit: Per Mr. Justice WILLIAMS.
2. The duty imposed upon the lessee in a leasehold operated for gas, can-
   not be measured by the same rule applied in the same manner as in
   the case of a leasehold operated for oil; the peculiar characteristics of
   the business of producing and transporting natural gas being such as
   to distinguish it for some purposes from operations for oil.
3. In an action against a lessee who had drilled one paying gas well
   upon the premises, for not putting down other wells to protect the terri-
   tory against the effect of operations on adjoining lands, it was error to

charge that a failure to drill such wells was a breach of an implied covenant imposing a liability in damages, in the absence of a reasonable excuse therefor.

4. Moreover, when a lease provides that all wells shall be located by the lessor, he may not maintain an action against the lessee for not drilling additional wells, if he never fixed upon a location for any additional well, or called upon the lessee to locate one for him; the lessee having no right to drill except at points indicated by the lessor.

5. Whether, when one paying well has been put down, under a lease containing no express covenant to sink other wells, and the well so drilled has been accidentally destroyed while producing gas in paying quantities, the lessee will be obliged to drill another well in its place, or must abandon the premises. not decided.

Before STERRETT, GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 104 October Term 1891, Sup. Ct.; court below, No. 207 November Term 1890, C. P.

On September 22, 1890, H. O. McKnight brought assumpsit against the Manufacturer's Natural Gas Company, to recover damages for alleged breaches of covenants contained in an oil and gas lease, the breaches assigned in the statment of claim being mismanagement of a natural-gas well drilled upon the land by the defendant company, and the failure to drill other wells requisite to the proper development of the land as gas territory. The defendant pleaded non assumpsit.

At the trial, on February 26, 1891, the following facts were shown:

On October 29, 1884, the plaintiff leased his farm containing two hundred and fifty acres to the Canonsburg Iron Company, Limited, the material provisions of the lease being as follows:

"Witnesseth: That the said party of the first part, in consideration of the stipulations, rents and covenants hereinafter contained, on the part of the said party of the second part, its executors, administrators and assigns, to be paid, kept and performed, has granted demised and let unto the said party of the second part, its executors, administrators and assigns, for the sole and only purposes of mining and excavating for petroleum, carbon oil or gas, and for the laying of pipe under said surface for transportation of oil or gas, for and in consideration of the sum of one dollar in hand paid, I do hereby lease all of

that certain tract of land situate in Chartiers township, Washington county, and state of Pennsylvania, bounded and described as follows, to wit: . . . . To have and to hold the said premises for the said purposes only, unto the said party of the second part, its executors, administrators or assigns, for, during and until the full term of twenty years next ensuing the day and year above written.

" The said party of the second part hereby covenants, in consideration of the said grant and demise, to deliver unto the said party of the first part, his heirs and assigns, the full equal one eighth part of the petroleum or carbon oil discovered, excavated, pumped and raised on the premises herein leased, as produced, excavated or pumped in the crude state; the said first party to furnish tankage for the same until pipe line is provided. . . . .

" The party of the second part covenants to commence operations for said mining purposes within eighteen months from the execution of this lease. Party of the first part reserves the right to locate wells. And a failure on the part of said second party to comply with either one or the other of the foregoing conditions, shall work an absolute forfeiture of this lease. If said second party fails to get oil in paying quantities in any well drilled on the within described land, but a sufficient flow of gas should be obtained to justify said second party in utilizing it at some other point not on the premises where said well is located, then the said second party agrees to pay to said first party a money royalty of one eighth of the net proceeds in cash, for each and every well so worked, as long as said well is so utilized. Said money royalty shall be paid in semi-annual instalments, one payment at the end of each half year. If gas should be found in considerable quantities in any well drilled on the within described land, then the said second party agrees to pay to said first party one eighth of the amount obtained for said well in the event of a sale of said well. " . . . .

By virtue of certain assignments, the leasehold estate created by the foregoing lease, became vested in the defendant company on December 15, 1885. In September, 1886, the defendant completed a producing gas well, upon a location made by the plaintiff at the southern end of the ·farm, and thereafter the gas in this well was utilized until some time in the spring

Statement of Facts.

of 1889. By an agreement between the plaintiff and the defendant company, dated October 13, 1886, the provisions of the lease were so far modified as to provide that the defendant should pay the plaintiff one thousand dollars annually for " each and every gas well having a pressure of seventeen pounds over an open five and five eighths inch casing " and utilized at any point not on the leased premises, and that, if the pressure of any well or wells should decrease materially, the amount of the annual rental should be reduced in the same proportion. By another paper dated August 1, 1888, the plaintiff agreed to accept seven hundred and fifty dollars in satisfaction of the rent on the well drilled as aforesaid, from October 19, 1887, to October 19, 1888, and it was stipulated further as follows :

" And it is further agreed that, since said well has been drilled deeper and the gas increased so that the same can be utilized and the pressure sufficient to use in the city of Pittsburgh, the annual royalty to be paid to H. O. McKnight shall be five hundred dollars per annum, so long and during such term as the said well is so utilized; payment of the royalty shall be semi-annually."

In the spring of 1889 the packer in the well drilled by the defendant got out of order ; and in the course of an effort to remedy the trouble, an accident occurred which, in the opinion of the defendant's agents, made it necessary to abandon the well, and it was accordingly abandoned and plugged after unsuccessful efforts to clean it out. No other well was drilled to take its place, and this well was the only one ever drilled on the plaintiff's land.

The plaintiff being upon the witness stand, his counsel made the following offer :

Plaintiff proposes to prove by the testimony of himself and other witnesses, that his entire farm of two hundred and fifty acres, as described in this lease in evidence, was, in the years 1886–1887, good gas territory ; that, in order to properly develop and operate this tract of land, it was necessary for the defendant company to drill and operate at least three or four wells on the same ; that there has been an abundant. market for gas in that territory ever since September 1, 1886 ; that five or more wells were drilled on the lands adjoining this lease in the years 1887–1888, which wells have ever since been

Statement of Facts.

draining the lands described in this lease; that the defendant company neglected and refused to drill any additional wells on the plaintiff's land, and also neglected and refused to protect this land leased to them from drainage by wells drilled on adjoining tracts; and that, by this failure of the defendant, the plaintiff has suffered great loss and damage. The purpose of this offer is to show that the failure of the defendant company to develop and operate this land has caused the plaintiff great damage, as set forth in his statement; and for the further purpose of ascertaining the amount of damages sustained by the plaintiff by reason of the failure of the defendant company to keep its covenants as set forth in the lease.

Objected to : (1) As irrelevant and incompetent; (2) for the reason that the written agreement on which this action is based imposes no liability upon the defendant company to drill additional wells on the plaintiff's farm; (3) the duties and liabilities of the defendant company are to be measured by the terms of the written agreement, aided by the circumstances surrounding the parties at the date of the agreement in 1884, and not by the subsequent developments on the adjoining farms in 1886–1888; (4) the defendant company is not liable in damages for any alleged drainage of gas from this farm by reason of operations on adjoining tracts of land; (5) for the reason that under the terms of the written agreement, the sale of the gas from any well is a condition precedent to the right of the plaintiff to receive any compensation from the defendant.

By the court : Since looking at these papers, we think it not necessary to have any further discussion until the end of the case. This testimony, we think, is admissible at this stage of the case, and as to whether or not the defendant company was bound to protect from drainage, that is a question we will not decide now. The proposition here, is to prove this property was not properly developed, that it was good gas territory, and that there was a market for the gas, and that to properly develop it up to the time this suit was brought there ought to have been two or three wells drilled. We think it is proper testimony; but, as to the measure of damages from other parties operating on adjoining lands, that is a question to be decided hereafter. Objection overruled; exception.[4]

The plaintiff then testified that after the completion of the

well drilled on his farm, all the land surrounding the farm was leased for oil and gas purposes by other companies, and wells were drilled upon tracts adjoining it on the north, east and south, all of which were producers of gas, and most of them close to the boundary lines of his farm; that the witness urged the defendant to have additional wells drilled upon his farm, but nothing was done in pursuance of his requests; that after the well on his farm was plugged, the defendant took away the boiler and engine that had been used at it, and took up the line of pipe connecting his farm with the defendant's gas main. Other witnesses testified that about the time the McKnight well was completed, it would have been a prudent thing to drill another well on the farm, provided the company had a market for the gas.

Testimony given on cross-examination of witnesses for the plaintiff, and testimony of witnesses called by the defendant, tended to show the facts stated in the opinion of the Supreme Court, infra, respecting the nature of the gas business, the necessity of having in a gas well rock pressure and volume of gas proportioned to the pressure that had to be carried in the main by which the gas was transported to the point of consumption, and the effect, in lessening the rock pressure and volume, of drilling other wells in proximity to a producing gas well. It was shown, further, by the defendant that at the time the lease of the plaintiff's land was made, the defendant company had not been organized, and that its pipe line to the city of Pittsburgh was not completed for about two months after the McKnight well was drilled in, and during that period the well was leased to another company; and that for months after the completion of that line the defendant had more gas than it could get customers for; and witnesses testified that it would not have been prudent management for the defendant to proceed to drill additional wells on the plaintiff's farm.

Among the wells drilled on tracts adjoining the farm of the plaintiff, were three belonging to the Royal Gas Company, located on land of Robert Thompson, two of which were shown to be fair producers. The rock pressure of those wells having been shown by the testimony, the defendant offered to prove by James O'Hara, the pressure carried in the lines of the Royal Gas Company, for the purpose of showing that, while a well

Charge of Court below.

or other wells might be operated on adjoining territory, it would have been of no value to the Manufacturers' Natural Gas Co., with the pressure carried in their lines.

Objected to : (1) For the reason it is incompetent and irrelevant. (2) The question of market is to be decided by the general market, not the special market of any particular company; and therefore they cannot prove the well might have been used in another company or by other parties but could not be used by themselves, for the purpose of relieving them from damages.

By the court : Objections sustained; exception.[6]

The testimony being closed, the court, McILVAINE, P. J., charged the jury in part as follows :

The plaintiff in his statement avers, in the first place, that this well, that was a paying well, one for which, to the time that it got into a condition that it had to be abandoned, the defendant company was paying Mr. McKnight five hundred dollars a year, was negligently or purposely plugged, spoiled and ruined. And the first claim of Mr. McKnight is, that he ought to be paid for that well, that is, the royalty or rental, the same as if it had continued a paying well, for the reason that the company negligently or purposely destroyed the well. Now, gentlemen, I do not think it is necessary to say very much on this branch of the case. In our opinion, the plaintiff fell far short of showing that this well was purposely, or even negligently destroyed for the purpose of getting rid of the payment of the rental these parties were paying. [Of course, if this well was purposely destroyed by these parties, in order to avoid the payment of the rental, and you believe it was a good well producing gas at that time, and would have continued to produce gas up until the date this suit was brought, Mr. McKnight would be entitled to his annual rental, if that was actually the case. But, on the other hand, if you believe that this well was manipulated in the ordinary way, with ordinary care and caution, and this was a mishap that might happen with any operator in the gas and oil field, and that this valuable well was spoiled by one of the inevitable accidents of the business, then of course the rental would stop when the well stopped to flow.][7] It was an accidental loss, a joint loss to Mr. McKnight and the

Charge of Court below.

defendant company; and Mr. McKnight's rental would have to stop, because he could not hold the company responsible for an inevitable accident in the due management, the careful management of the business.

Now, this brings us to the plaintiff's second claim, which is two-fold, and that is this: In the first place, the plaintiff claims that, when the company drilled in the first well and it proved to be a good well, it ought then to have drilled a second well, as the farm would have borne a second well, the territory being good. The plaintiff also claims, that when this first well was destroyed, intentionally or otherwise, it was the duty of the company to drill another well in place of it; and that a reasonable development of the farm and due diligence on its part under the lease, required it to do this; and as it has not done so, he is entitled to such damages, up until the suit was brought, as he has sustained by the company not drilling these wells.

Now, as I have already said, there is nothing in the expressed terms of this lease to compel the defendant to drill a second or third well. As I said before, the only condition in regard to wells in it is, that the first well should be commenced within eighteen months; as to other wells, it is silent as to the time when they should be drilled, during the existence of the lease, which runs for twenty years; and the plaintiff does not, as I understand it, make any claim that there is anything in this lease expressed, that puts upon the defendant company an obligation to drill a second well at any particular time; but they claim that, under the language of the lease, the true intent and meaning thereof was that the land should have been developed in a reasonable and in a business-like way, for the common benefit of both parties. And we think that this is a proper interpretation of the lease. And that raises the question, then, whether or not the manner in which this farm was developed, was a reasonable development, a development in a business-like way.

The question, then, for you to determine is this: [Has this company failed to do that which it was bound to do under this lease? Has it, or had it, on the twenty-second day of September, 1890, when this suit was brought, failed to reasonably develop this farm of Mr. McKnight, embraced in the lease offered in evidence, by not properly caring for and maintain-

*Charge of Court below.*

ing the well that was drilled, or in not drilling enough
wells?] [8] In determining this question, a number of other
questions arise and must be considered. First, what was the
character of the land embraced in the lease ? Was it all good
gas territory? Was enough of it good gas territory, so as to
require more than one well to drain and develop it ? What
was the character of the development in the immediate neigh-
borhood ? Was it of such a character as to make it necessary
for a more speedy development, in order to work the lease in a
reasonable and business-like way, or was it of such a character
as to make it unadvisable and unprofitable to drill more wells?
What was the demand for gas, when produced? Was it of
such a character as to necessarily require and demand a slow
development, or did it require and justify a speedy develop-
ment?

When a farmer leases his farm for oil and gas, he does not
warrant, nor is there any implied covenant on his part, that
the lessee will get oil or gas if he drills; and if the lessee
drills and gets a dry hole, and his lease proves to be without
oil or gas, the lessee cannot recover damages from the farmer
for leasing him land for oil and gas purposes that has no oil or
gas in it. So, on the other hand, the farmer who leases his
land for oil and gas purposes, where there is some oil and
some gas, cannot compel the lessee, in the absence of an ex-
press covenant, to drill wells when such drilling would be a
dead loss, nor can he recover damages from the lessee on an
implied covenant, for not drilling wells which would be drilled
at a dead loss on account of a lack of gas in the sand, and
which it would be unreasonable, in a business sense, to compel
him to drill. . . . . .

Again ; the lessee company in this case, is the owner of this
lease, and it must be allowed to manage the development of
the territory to best subserve the interests of the trade and the
business in which it is engaged, provided such management is
reasonable under all the circumstances. The lessor cannot
lease his farm on a royalty for oil and gas purposes for twenty
years, and arbitrarily demand that the farm should be fully
developed and exhausted within two or three years, but can
only demand that the company, under all the circumstances,
proceed with reasonable diligence and in a business-like way

to produce the gas. The lessee is only bound under its implied contract to develop the land in a way that subserves its interest as well as that of the lessor; that is, for their common benefit, and not solely for the benefit of the landowner, and to the loss of the company.

Testimony has been admitted, gentlemen of the jury, about the wells on the adjoining farms, and about them draining the gas from under this farm. We instruct you as a matter of law that this plaintiff cannot recover the price of any gas that is taken out of the wells on the adjoining farms. Every man has a right to put down a well on his own farm where he pleases; and the man that owns the adjoining farm cannot claim a part of the gas as his, and ask for damages for the gas that is taken from a well on the adjoining farm; and we instruct you, further, that there was no obligation on this defendant company to drill wells along the line or lines of the McKnight farm, opposite wherever there might be a well drilled on an adjoining farm belonging to some other company. There is no obligation on the company to fight or protect lines in that way; but this evidence was introduced properly for the purpose of showing the character of the territory out in that locality; that it was a good gas territory, as claimed by the plaintiff; and also, as being a circumstance that may be taken into consideration when you come to determine the general question whether or not, under all the circumstances, this company had reasonably developed this territory of Mr. McKnight up to the time this suit was brought.

[If you find from the evidence that, under the true intent and meaning of the lease as we have interpreted it, the defendant has not developed the plaintiff's farm in a reasonable and business-like way, but has violated or broken its implied obligation so to do, then the next question is, how much] 9 if any, had this failure of the defendant company damaged the plaintiff at the time the suit was brought, on the twenty-second day of September, 1890.

The rule of damage in a case of this kind, is compensation. That is, you cannot give or assess damages to punish the company for not doing its duty, but you must limit the damages assessed to such a sum as will compensate the plaintiff for the injury which he has shown he has sustained; that is, how

much better off, in dollars and cents, does the evidence show that he would have been, on September 22, 1890, when this suit was brought, if the company had developed his farm in a reasonable and business-like way, than he was on that date, the farm having been operated by the company as it was? How much more rental or royalty would he have received, under his contract with the company, fairly and reasonably performed by it, than he did receive?

The plaintiff asks us to charge you as follows:

1. That by the terms of the lease to the Canonsburg Iron Co., Limited, the lessee was bound to begin operations within eighteen months after the execution of the lease, or forfeit its rights under the same, and then to continue operations with due diligence.

Answer: Affirmed; but what is due· diligence is a question for the jury, ·under the evidence and the instructions we have given them.[1]

2. That, having commenced operations on this lease, the lessee and the defendant under it were bound to prosecute the business of developing, drilling for gas or oil and securing the same, without interruption, for the common benefit of the parties.

Answer: Affirmed; unless the evidence shows that there was a reasonable excuse for such interruption.[2]

3. The implied covenant contained in this lease runs with the land, and this implied covenant required that defendant company should have developed and protected this property by drilling wells and carefully operating the same.

Answer: This point is refused. The express terms of the lease gave the defendant company twenty years from its date to continue the development and to exhaust the gas in this farm, and it is for the jury and not the court to say whether there is evidence in the case that would require, before the bringing of this suit, the full development of this property.

5. If the jury believe that gas is a mineral of such a nature that if not utilized at a proper time it may be lost forever, then it was the duty of the defendant company to promptly develop and operate the plaintiff's land, in order to secure the gas before it was lost; and its failure to thus develop and operate this territory would be such a breach of its implied covenant as to render the said defendant company liable to the

Charge of Court below.

plaintiff in damages for its neglect to obtain and market this gas, provided there was a market for the same.

Answer: This point is affirmed; provided the prompt development and operation of the plaintiff's land was not reasonably excused by facts and circumstances that may appear from the evidence.[3]

6. If the jury believe that the operations upon adjoining tracts tended to damage the plaintiff's land, unless the defendant company drilled wells to secure the gas, then it was the duty of the defendant company to drill an additional well or wells and secure the gas promptly; and its failure to do this was such negligence as to entitle the plaintiff to damages from the said defendant company for such negligence up to September 22, 1890.

Answer: This point is refused. There are other facts, under the evidence in the case, to be considered in determining whether the defendant company has violated its implied covenant to develop this farm in a reasonable and business-like manner.

7. That if the jury believe from the evidence that defendant company should have drilled and operated another well on this McKnight land, then they should ascertain the damages sustained by the plaintiff on account of the defendant company's failure to drill a second well or a third; and that the jury may ascertain these damages by considering all the circumstances and facts proven in the case.

Answer: This point is affirmed, with this instruction, that the plaintiff can only recover damages sustained when this suit was brought, September 22, 1890.

8. That the jury may ascertain from the facts proved in the case what would have been the probable life in years of a second well drilled on this lease and properly operated by defendant company, and then estimate the damages by finding the value for the number of years which it would live, at the amount of the annual payments to lessor agreed upon between the parties.

Answer: This point is affirmed with the same remark, that the damages sustained must be confined to a time prior to September 22, 1890.[5]

10. If the defendant company abandoned this well even in good faith, then it was its duty to have drilled an additional well.

Arguments.

Answer: Refused.    This is a question for the jury under the evidence and not for the court.

—The jury returned a verdict for the plaintiff for $1,000. Judgment having been entered, the defendant took this appeal, assigning for error:

1–3. The answers to plaintiff's points.[1 to 3]

4. The admission of plaintiff's offer.[4]

5. The answer to plaintiff's point.[5]

6. The refusal of defendant's offer.[6]

7–9. The parts of the charge embraced in [ ] [7 to 9]

*Mr. R. W. Irwin* and *Mr. George W. Guthrie* (with them *Mr. M. C. Acheson*), for the appellant:

The court below erroneously assumed that there was an implied covenant, on the part of the defendant, regulating the manner in which it should develop the plaintiff's farm for gas.

1. (*a*) The lease contained express covenants defining the lessee's duty, to wit, to commence operations in eighteen months, and granted a term of twenty years in which to complete them, thereby excluding any implication on these points: Hale v. Finch, 104 U. S. 261; Maryland v. Railroad Co., 22 Wall. 105; Stoddard v. Emery, 128 Pa. 436; 1 Wood on Land. & T., 694, 699; Smiley v. McLauthlin, 138 Mass. 363; Churchward v. Reg., L. R. 1 Q. B. 195; Aspden v. Austin, 5 Q. B. 671; 1 Woodfall on Land. & T., 176; Taylor on Land. & T., § 252.    (*b*) The situation of the parties and the subject matter of the lease exclude the idea of any such implication, the proper conclusion being that, in view of the uncertainties of the gas business, then in its infancy, the lessee intentionally omitted to covenant for the drilling of as many wells as a jury might subsequently guess were necessary, or would have been profitable: Sheets v. Selden, 7 Wall. 423; James v. Cochrane, 7 Exch. 170; Aspden v. Austin, 5 Q. B. 671; Dunn v. Sayles, 5 Q. B. 685; Bute v. Guest, 15 M. & W. 160; Smith v. Mayor, 2 C. B., N. S., 651; Sharpe v. Waterhouse, 7 E. & B. 816; Rashleigh v. Railway Co., 10 C. B. 612; Maryland v. Railroad Co., 22 Wall. 105; Thorn v. London City, L. R. 10 Exch. 123; Midland Ry. Co. v. Railway Co., L. R. 2 Eq. Cas. 524; Maw v. Hindmarch, 28 L. T. 644; Williamson v. McClure, 37 Pa. 402; Lacy v. Green, 84 Pa. 514; Coffin v. Landis, 46 Pa. 426.

Arguments.

2. The case is radically different from Koch's App., 93 Pa. 434, and Watson v. O'Hern, 6 W. 362, in each of which the subject of the contract was a mineral open to view; but is almost identical with Smiley v. McLauthlin, 138 Mass. 363. See also Quarrington v. Arthur, 10 M. &ʷW. 335. The conduct of the lessor is a guide to the construction of the agreement: Lehigh Coal & N. Co. v. Harlan, 27 Pa. 439; and the fact that he never demanded, as a right, the drilling of additional wells, shows that he considered this entirely optional with the company. Moreover‚ as he never fixed a location for another well, the lessee neither was bound, nor had it the right to drill one.: Williams v. Bentley, 27 Pa. 294; Henry v. Raiman, 25 Pa. 354; Keeler v. Schmertz, 46 Pa. 135; Adams v. Williams, 2 W. & S. 227; Fame Ins. Co.'s App., 83 Pa. 396; Weichardt v. Hook, 83 Pa. 434; Jennings v. McComb, 112 Pa. 518; Niagara Ins. Co. v. Trust Co., 123 Pa. 516. The necessity for his making such location would not be dispensed with by a mere assertion of the lessee that it would be unable, or would refuse to drill the well: Benjamin on·Sales, § 568; Cutter v. Powell, 2 Sm. L. C. 1; Hamilton v. Crossman, 130 Pa. 320; Smoot's Case, 15 Wall. 36. If any covenant could be implied, it would be, not to do whatever a jury might say ought to be done, but to comply with the usage and custom of the trade : Stoddard v. Emery, 128 Pa. 436.

3. However, if any implication is admissible, in the face of the express stipulations, full protection would be given to the lessor by implying a condition instead of a covenant: Clement v. Youngman, 40 Pa. 341 ;· Tielens v. Hooper, 5 Exch. 830; Clifford v. Watts, L. R. 5 C. P. 577; Brown v. Vandergrift, 80 Pa. 142. And there was no evidence to justify the submission of the question whether the defendant had negligently or wilfully destroyed the well drilled by it, and the submission was error: Ford v. Anderson, 139 Pa. 261. And the measure of damages adopted was inconsistent with the rights and obligations of the parties as fixed by the lease: Clifton v. Walmesley, 5 T. R. 564; Gerrard v. Clifton, 7 T. R. 676; Edwards v. Reese, 7 C. & P. 340. It was also grossly speculative. It went far beyond that adopted in Bradford Oil Co. v. Blair, 113 Pa. 83. We suggest that if the plaintiff was entitled to recover, the measure of damages would be the bonus or rental

usually paid on farms rented for gas purposes, until wells are
drilled. The testimony set out in the sixth assignment of
error, directly met the plaintiff's case, and should have been
admitted.

*Mr. James P. Sayer* (with him *Mr. J. W. McDowell* and
*Mr. J. L. Judson*), for the appellee :

The neglect of the lessee promptly to operate the land leased,
may lead to the entire loss of the oil or gas, as in the case at
bar, and the law certainly implies a covenant so to operate :
Brown v. Vandergrift, 80 Pa. 147 ; Koch's App., 93 Pa. 434;
Watson v. O'Hern, 6 W. 362. While it is true that in Koch's
Appeal and Watson v. O'Hern the mineral was open to view,
and that neither of the parties could be positively assured of
getting a paying gas well on the leasehold now in question,
they were reasonably sure of this, and the defendant took the
risk of doing so, upon the conditions of the contract. There
can be no question that the lessee was bound to commence
operations within eighteen months, or that it was bound to
continue operations with due diligence. The only question,
what is due diligence ? was properly left to the jury. The
provisions of the lease show that the parties contemplated
more than one well, and it was proper to show that more than
one well was necessary to the proper development of the land
as gas territory. And the jury were correctly instructed as to
the measure of damages, and the defendant's offer was prop-
erly rejected for the reasons stated in the objection to it.

In a supplemental brief for the appellee, filed by leave of
the court on November 2, 1891, counsel cited : Easterly v.
Sampson, 17 E. C. L. R. 428 ; Midland Ry. Co. v. Railway
Co., L. R. 2 Eq. Cas. 524.

OPINION, MR. JUSTICE WILLIAMS :

A lease of the surface for agricultural purposes implies, if it
does not express an agreement on the part of the lessee to culti-
vate the demised premises in accordance with the ordinary meth-
ods of husbandry. Without such cultivation, the premises will
not be productive, and the landlord will suffer a substantial loss.
A lease of a mine or a quarry, at a rental to be fixed by refer-
ence to the quantity of material removed therefrom, implies

an agreement on the part of the lessee to work the mine or quarry. The reason is that, while the lessor does not lose his material out of the mine or quarry, he loses his income therefrom: Watson v. O'Hern, 6 W. 362; Koch's App., 93 Pa. 434. A lease of land for oil purposes imposes a somewhat different obligation upon the lessee. The oil is of such a nature that, if not removed through wells upon the surface of the leasehold, it may be wholly lost to the owner of the land by reason of operations on lands adjoining. The duty to develop the land, that is, to test thoroughly the existence of oil in the rocks that should bear it, and if oil be found, to sink so many wells as may be reasonably necessary in view of surrounding operations to secure so much of the oil underlying the land as may be obtained with profit, grows out of the nature of oil, and the methods by which the oil is reached and brought to the surface. An oil lease must be construed, therefore, with a due regard to the known characteristics of the business: Brown v. Vandergrift, 80 Pa. 142.

Oil and gas leases are ordinarily combined in the same instrument, and are classed together. For many purposes, such classification is natural and appropriate; but this case brings us to consider an important difference between oil and gas, which makes it necessary to distinguish for some purposes between an oil and a gas lease.

Oil, when brought to the surface, is gathered into a receiving tank or tanks at or near the well. When necessary or desirable, it is removed by gravity, or by pumping, into the pipe lines that serve the district in which the well is located, and conveyed to storage tanks, where it remains until delivered to a purchaser. It is a matter of no consequence what the pressure may be at the well, for there can be none in the tanks, except that of gravity. The well that throws off violently its five thousand barrels per day, and that which reluctantly gives up four or five barrels under the persuasive power of the pump, will have their product gathered into the same lines of transportation, or resting in the same storage tanks. Gas cannot be gathered, stored, or transported in this manner. If found in sufficient quantity, it is turned from the well into the line, and the pressure at the mouth of the well is the motive power by which it is driven through the line to the consumer miles

Opinion of the Court.

away. If the pressure at a given well is much below that in the line with which it is connected, the gas from that well cannot enter the line, but will be driven back by the superior force it encounters at the point of connection. For this reason, a well producing gas in sufficient quantity to be profitably utilized if there was a market for it near at hand, may be entirely valueless if its product must find a market at a distance too great to justify its transportation by a line of its own. In an oil district, each well, no matter how large or how small its product may be, is separately operated, and a well may be profitably operated so long as its yield pays more than the cost of producing the oil. In a gas district this is impracticable. The product of many wells is gathered into one line, so long as the pressure is sufficient. When the pressure in any one falls below the standard necessary for purposes of transportation, that well must be turned off. Its product cannot be transported separately, and, unless it can be used near by, it is valueless. These well-known facts peculiar to the production of gas must be taken into account in the construction of leases for gas purposes.

The lease now before us shows that the parties to it were familiar with these facts, and that they dealt with the subject intelligently. The lease covered the lessor's farm of two hundred and fifty acres, was to continue twenty years, and was for the "sole and only purpose of mining and excavating for petroleum, carbon oil, and gas." Operations were to commence on the land within eighteen months after the execution of the lease, and the lessor reserved to himself the exclusive right to locate all wells that should be put down upon it. If oil was not found in paying quantities, but a sufficient flow of gas was obtained by the lessee to justify an effort to utilize it beyond the premises on which it was found, the lessee was to pay a money royalty equal to "one eighth of the net proceeds" of the gas so obtained and utilized off the premises. The royalty was changed by supplemental agreements, but the question now raised rests on the provisions of the original lease. If oil had been found in paying quantities in the first well, it is probable that the lessee, although not bound by an express covenant to do so, would have been under obligations to put down an additional well or wells, so as properly to test and develop the pro-

duction of the farm of the lessor, upon a consideration of the character of the territory and the work being done on adjoining lands. But oil was not obtained, and so much of the contract as relates to it is now without significance. The parties had anticipated this contingency, and provided for it. Their contract made it the duty of the lessee to pay a royalty for gas, if the flow was sufficiently strong to enable him to utilize it off the premises; that is, if it was sufficiently strong to justify its transportation by means of a pipe line to some market, off the premises, for sale. In that case, the royalty was to be one eighth of the net proceeds of the gas so utilized. The flow of gas was sufficiently strong. The lessees arranged to utilize it by means of a branch line, built to reach this well. Meantime it was sold to another company that continued to use it until at or about the time the line was finished, and the well turned into it. This was in December, 1886. It remained in the line until the spring of 1889. The packer got out of order, and an effort was made to draw the casing and clean out the well. An accident prevented this being done, and the well was abandoned.

This action was brought in 1890, upon the theory that the lessee was under an implied covenant to put down other wells upon the premises, to protect its lines against operations upon adjoining farms by other parties. This theory appears in the plaintiff's second point, which is as follows: "That, having commenced operations on this lease, the lessee and the defendant under it were bound to prosecute the business of developing, drilling for gas or oil, and securing the same, without interruption, for the common benefit of the parties." The court made answer as follows : " Affirmed ; unless the evidence shows that there was a reasonable excuse for such interruption." Again, in the plaintiff's fifth point, the court was asked to say that, if the jury find gas to be a mineral of such nature that if not utilized at a proper time it may be lost forever, then it was the duty of the defendant to operate the plaintiff's land so as to secure the gas before it was lost, and its failure to do so was a breach of an implied covenant which renders it liable to damages. This point was affirmed, with the following qualification : "Provided, the prompt development and operation of the plaintiff's land was not reasonably excused by facts and circumstances that may appear from the evidence." The jury was thus left

Opinion of the Court.

to apply the same rule, in the same manner, to a gas lease, that might be applied to a lease for the production of oil.

As we have already seen, every barrel of oil brought to the surface may be utilized in the same way. Whether the well that produces it is a strong one, yielding many barrels per day, or a weak one, yielding but few, is a matter that in no way affects the ability of the producer to market his oil, or the price to be obtained for it. In gas territory, the lessee may sink many wells, and find gas in them all, but he can utilize only such of them as have a volume and pressure sufficient to enable him to transport the gas through his line, and deliver it to the purchaser. If no one of them has the requisite pressure, then no one of them can be utilized ; the gas must be wasted, the cost of the wells will be lost, and the lessor entitled to no royalty. What is the proper way to develop and operate a gas lease is, therefore, a question beset with some difficulty. Its settlement requires some general knowledge of the business, and some knowledge of the local field. The lessee may have a good well, from which he can utilize the gas with profit. He may put down another on the same farm, and thereby so reduce the pressure in the first as wholly to destroy its value, without getting a sufficient pressure at the second to enable him to utilize that. The gas, if coming from one well, would be of great value. Divided in such manner that the volume and pressure at each is below the necessary standard, the whole is lost. Thus the application of the rule laid down by the court below, as the jury must have understood it, might result in this, that the effort of the lessee to discharge the implied obligation of his contract for the common benefit, should end in the total destruction of the leasehold and a common misfortune. The mistake of the court below was in failing to take account of, and to read into the contract between the parties, the peculiar nature and characteristics of the business of producing and transporting gas, which the parties themselves well understood, and which their contract shows were before their minds when it was entered into.

But the designation of the point at which all wells should be located was the right of the lessor. We do not see, in the testimony as printed, that he ever fixed upon a location for another well, or called upon the defendant to locate one for him. He

Syllabus.

says more wells should have been put down; but the lessee had no right to put them down, except at the points which he should indicate as the location he had fixed upon. Whether the defendant is justified in abandoning the premises altogether because of the accident to the well in 1889, is a different question, and one not fairly raised upon this record. The defendant cannot hold the premises and refuse to orperate them. This question may assume more importance upon another trial.

The judgment is reversed, and a venire facias de novo awarded.