## SMITH v. McGILL et al.*

(Circuit Court of Appeals, Eighth Circuit. April 2, 1926.)

No. 7048.

**1. Mines and minerals** ⊚⟹**79(3)—Distinction is recognized between covenant in oil and gas lease by lessee to pay amount in proportion to oil produced and covenant to pay fixed sum as periodic rental for gas well.**

In construction of oil and gas leases, distinction is recognized between a covenant by lessee to pay lessor an amount in proportion to oil which is produced, and covenant to pay lessor fixed sum as periodic rental for gas well.

**2. Mines and minerals** ⊚⟹**79(3)—Due diligence of lessee to produce and market oil is usually implied, if not expressed, in oil and gas lease providing payment in proportion to amount of oil produced.**

Where oil and gas lease contains covenant by lessee to pay lessor amount in proportion to oil produced, due diligence on part of lessee to produce and market oil is usually implied, if not expressed, as lessor's remuneration for grant depends on it.

**3. Mines and minerals** ⊚⟹**79(2)—Generally question whether gas found is in paying quantities is left to judgment of lessee, where lease provides payment of fixed sum as rental for gas well, and that gas must be found in paying quantities.**

Generally, where oil and gas mining lease provides for payment to lessor of a fixed sum, as rental for gas well, and also provides that gas must be found in paying quantities, or in quantities large enough to transport, question whether gas which is found is in paying quan-

tities, or in quantities large enough to transport, is left to judgment of lessee.

**4. Mines and minerals** ⊚⟹**78(7)—Lessor, seeking cancellation of oil and gas lease because of lessee's failure to find gas and oil in paying quantities as required, has burden of proof thereof.**

Lessor in oil and gas lease, alleging that lessee had failed to comply with conditions of lease in finding gas and oil in paying quantities within term, has burden of proof thereof.

**5. Evidence** ⊚⟹**574—Good faith of conclusion of lessee's superintendent that gas well under lease requiring production of oil or gas in paying quantities, was paying proposition, though marketing had been discontinued because of insufficient pressure, held not overthrown by lessor's opinion to contrary.**

Where lessee, under oil and gas lease providing that gas or oil must be found in paying quantities within term, produced gas well, piped gas therefrom for short period, when it was discontinued because of lack of pressure, and began to deepen well after expiration of lease, *held*, that good faith of conclusion of lessee's superintendent that at such time he considered it a paying well was not overthrown by lessor's opinion to contrary, nor because there was no immediate market for gas after flow into pipe line had ceased.

**6. Mines and minerals** ⊚⟹**78(1)—Lessor's delay in marketing gas from well from February 28 to May 24, while drilling well deeper, held not abandonment, nor unreasonable delay, where lessor had been offered payment of rental due on well for succeeding year.**

Where lessor had been offered payment of rental due him for succeeding year on gas well produced by lessee, delay from February 28 to May 24, incident to drilling well deeper and marketing gas from well, cannot be regarded as abandonment, nor as an unreasonable delay.

**7. Mines and minerals** ⊚⟹**78(2)—Lessee under oil and gas lease, providing for forfeiture unless oil or gas was found in paying quantities, did not lose right to continue in possession by drilling well deeper, when marketing gas became unprofitable because of lack of pressure.**

Where lessee under oil and gas lease, providing for forfeiture on failure to produce oil or gas in paying quantities, had produced gas in paying quantities, he did not lose his right to continue in possession by drilling well deeper, when marketing of gas became unprofitable because of lack of sufficient pressure to carry it over pipe line, since, if lower sand should prove unprofitable, lessee could return to upper sand and produce therefrom again.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Suit by J. T. Smith and another against J. R. McGill and another. Decree for defendants, and plaintiff named appeals. Affirmed.

*Rehearing denied July 1, 1926.

William H. Martin, of Tulsa, Okl. (Hulette F. Aby and William F. Tucker, both of Tulsa, Okl., and Eugene B. Smith, of Sapulpa, Okl., on the brief), for appellant.

Joseph L. Hull, of Muskogee, Okl. (Preston C. West, of Tulsa, Okl., Nathan A. Gibson, of Muskogee, Okl., and Roger S. Sherman and A. A. Davidson, both of Tulsa, Okl., on the brief), for appellees.

Before SANBORN, Circuit Judge, and MUNGER and JOHNSON, District Judges.

MUNGER, District Judge, delivered the opinion of the court. This suit was brought to cancel an oil and gas lease. There was a decree for the defendants and the plaintiff J. T. Smith has appealed. The parties will be referred to as they were designated in the court below. The plaintiffs alleged that they had acquired the title of the original lessor, and claimed that the original lessee had failed to comply with the conditions of the lease by finding gas or oil in paying quantities within the term of the lease, and that they had declared a forfeiture of it. The lessee claimed that it found gas in paying quantities, and had complied with the provisions of the lease. The lease granted to the lessee the oil deposits and natural gas in or under the land, with the right to extract and remove it, and incidental rights connected with such operations. The term stated was "ten years, and as much longer as oil or gas is found in paying quantities." The lessee agreed to pay the lessor, as royalty, 12½ per cent. of the gross proceeds of all crude oil extracted from the land. The lease contained provisions with reference to gas wells, as follows:

"The lessee shall pay as royalty on each gas producing well $300 per annum in advance, to be calculated from the date of commencement of utilization: Provided, however, in the case of gas wells of small volume, when the rock pressure is 100 pounds or less, the parties hereto may, subject to the approval of the Secretary of the Interior, agree upon a royalty, which will become effective as a part of this lease: Provided, further, that in cases of gas wells of small volume, or where the wells produce both oil and gas, or oil and gas and salt water, to such an extent that the gas is unfit for ordinary domestic purposes, or where the gas from any well is desired for temporary use in connection with drilling and pumping operations on adjacent or nearby tracts, the lessee shall have the option of paying royalties upon such gas wells of the same percentage of the gross proceeds

from the sale of gas from such wells as is paid under this lease for royalty on oil. The lessor shall have the free use of gas for domestic purposes in his residence on the lease premises, provided there be surplus gas, produced on said premises over and above enough to fully operate the same. Failure on the part of the lessee to use a gas-producing well, which cannot profitably be utilized at the rate herein prescribed, shall not work a forfeiture of this lease so far as the same relates to mining oil; but, if the lessee desires to retain gas-producing privileges, the lessee shall pay a rental of $100 per annum, in advance, calculated from date of discovery of gas, on each gas-producing well, gas from which is not marketed, or not utilized otherwise than for operations under this lease. Payments of annual gas royalties shall be made within 25 days from the date such royalties become due; other royalty payments to be made monthly on or before the 25th day of the month succeeding that for which such payment is to be made, supported by sworn statements."

"Upon the violation of any of the substantial terms and conditions of this lease, the Secretary of the Interior (or lessor, in event restrictions are removed as provided in paragraph 12 hereof) shall have the right, at any time after 30 days' notice to the lessee, specifying the terms or conditions violated, to declare this lease null and void, and the lessor shall then be entitled and authorized to take immediate possession of the land."

The 10-year period, mentioned in the lease, expired December 24, 1922. This suit was begun April 25, 1923. The lessee drilled one well on the land, which was begun in May 1922, and was finished in September, 1922, in which no oil nor gas was found. The expense of drilling this well was about $34,000. Another well was begun about November, 1922. At a depth of 1,200 feet gas was found, and an experienced oil operator testified that the flow was about 750,000 cubic feet, for which there was a market at the rate of 10 cents per 1,000 cubic feet. An oil company, which had a pipe line in the vicinity, laid a line to connect with this well, and purchased the gas. The gas had to be piped about 4 miles. The oil company purchased the gas from this well for the months of December, 1922, and January and February, 1923, but about February 28th it was discovered that the gas was not feeding into the pipe line because of lack of pressure. The gas could then have been sold to a drilling well that was near, but, instead of doing this,

the lessee about March 6th began to drill the well to a greater depth, and about May 24, 1923, at a depth of 3,400 feet, a flow of oil was found, at a rate of about 250 barrels per day. The well had continued to produce at a profitable rate to the time of trial.

On March 6, 1922, when the lessee started to deepen the well, there was 300,000 feet of gas in the well, which was blown off before the drilling operations proceeded. The superintendent of the lessee, who managed this well, testified that, when the deepening of the well began, he considered the well as a paying proposition; that there was a market for gas from the well around that locality for a drilling well, but that it would not have been profitable to market the gas locally at that time, as it would have required extra equipment. The cost of deepening the well was about $50,000. One of the plaintiffs testified to his opinion that this was not a paying gas well; but this opinion was based on the theory that a well could not be said to be a paying one, unless it not only paid a profit over the expense of operation, but also paid a profit on the investment. The other plaintiff also gave it as his opinion that a gas well producing 750,000 cubic feet was not a paying gas well, but said that he did not know what amount should be considered to be a paying gas well. Apart from this difference of opinion as to what constitutes a paying gas well, there was no dispute in the evidence. The lessee tendered to the plaintiffs, the successors to the lessor's rights, $300 about December 1, 1922, as payment of the royalty provided by the lease for a gas-producing well, but the payment was refused, because the plaintiffs did not consider the well as producing gas in paying quantities. At the time of refusing this proffered payment, the plaintiffs notified the lessee that the plaintiffs were informed that the gas well was not producing oil or gas in paying quantities, and that, if the condition was the same at the end of the term of the lease, the plaintiffs would expect the lessee to vacate the premises.

[1-3] One of the plaintiffs refused to join in this appeal, and an order of severance was made, so that this appeal is prosecuted by the other plaintiff. The claim of the appellant is that a decree should have been entered canceling the lease, because the evidence showed that the lessee was not finding oil in paying quantities as the lease required. In support of this claim, appellant asserts that gas was not being found in paying quantities, unless the well was paying the lessee a profit over the operating expenses, and that gas was not only being found, but was being produced, so as to pay the lessee this measure of profit. In the construction of leases of this nature, a distinction has generally been recognized between a covenant by the lessee to pay the lessor an amount proportioned to the oil which is produced, and a covenant to pay the lessor a fixed sum as a periodic rental for a gas well. As to the first-mentioned covenant, due diligence on the part of the lessee to produce and market the oil is usually implied, if not expressed, because the lessor's remuneration for the grant depends upon it. Brewster v. Lanyon Zinc Co., 140 F. 801, 72 C. C. A. 213; Union Gas & Oil Co. v. Adkins (C. C. A.) 278 F. 854. But where the lessor is to receive a fixed sum, in the nature of rental, for a gas well, the lessee is not held to the same degree of diligence in producing and marketing the gas which has been found in paying quantities.

Gas can ordinarily be marketed (except for minor uses) only through pipe lines, which often belong to others, and may have to be extended from a distance. Gas cannot profitably be brought to the surface and stored to await a market. Even if gas is marketed through a pipe line, if the pressure from a particular line falls below the pressure in the pipes by gas from other wells, the gas from the weaker well will cease to flow in the pipe lines. A temporary cessation of production and marketing of gas may not be unremunerative, because the final disposition of the gas may make the cessation advisable. McKnight v. Manufacturers' Natural Gas Co., 146 Pa. 185, 23 A. 164, 28 Am. St. Rep. 790; Eastern Oil Co. v. Coulehan, 65 W. Va. 531, 64 S. E. 836; Transcontinental Oil Co. v. Spencer (C. C. A.) 6 F.(2d) 866.

While these problems present difficulties to the lessee, the lessor suffers no loss as to a well in which gas has been found, so long as the rental is paid to him for the gas well. It is therefore the generally accepted rule that, where an oil and gas mining lease provides for the payment to the lessor of a fixed sum, in the nature of rental, for a gas well, and the lease also provides that gas must be found in paying quantities, or in quantities large enough to transport, the question whether the gas, which is found, is in paying quantities, or in quantities large enough to transport, is to be left to the judgment of the lessee, acting in good faith. McGraw Oil & Gas Co. v. Kennedy, 65 W. Va. 595, 64 S. E. 1027, 28 L. R. A. (N. S.) 959; Lowther Oil Co. v. Miller-Sibley Oil Co., 53 W. Va.

501, 44 S. E. 433, 97 Am. St. Rep. 1027; Young v. Forest Oil Co., 194 Pa. 243, 45 A. 121; Summerville v. Apollo Gas Co., 207 Pa. 334, 56 A. 876; Manhattan Oil Co. v. Carrell, 164 Ind. 526, 73 N. E. 1084; Osburn v. Finkelstein, 189 Ind. 90, 126 N. E. 11; Bay State Petroleum Co. v. Penn Lubricating Co., 121 Ky. 637, 87 S. W. 1102; Hennessy v. Junction Oil & Gas Co., 75 Okl. 220, 182 P. 666; Roach v. Junction Oil & Gas Co., 72 Okl. 213, 179 P. 934; Union Gas & Oil Co. v. Adkins (C. C. A.) 278 F. 854, 857; Thornton on Oil & Gas (4th Ed.) § 148; Morrison & De Soto, Oil and Gas Rights, p. 91.

In the case of Roach v. Junction Oil & Gas Co., 72 Okl. 213, 179 P. 934, cited above, the court said:

"And, when defendant found gas in quantities large enough to transport within five-year period, it then became vested with a limited estate in the premises for the purpose of transporting this gas according to the terms of the lease. The lease does not necessarily mean that the gas should in fact be transported within the five years. Upon the discovery thereof in quantities large enough to transport, the plaintiff was entitled to $100 per year for the product of each and every well so transported, and this sum was tendered to her by defendants in accordance with the terms of the lease. The amount of her revenue did not depend upon the amount of gas transported, but was a fixed and definite sum, with the additional privilege of using gas for domestic purposes. So long as she received payment of the $100 per annum and had the use of gas for domestic purposes, she was entitled to claim no other revenue or consideration from lessee on account of the well in question."

And in the case of Summerville v. Apollo Gas Co., 207 Pa. 334, 56 A. 876, cited above, the court says:

"It may be that for some time the lessee was not able to find a purchaser for the gas, but that was not the affair of the lessors; they were not interested in the proceeds of the sale of the gas. Their rights under the agreement extended only to the receipt of a stipulated annual rental for each well, and the free use of gas for domestic purposes. Beyond this, the question of whether or not the quantity of gas was profitable was for the decision of the lessee. It may be that the final disposition of the product of the well was such as to amply remunerate it for the delay in finding a market."

[4-7] Does the evidence in this case show that the lessee did not act in good faith in claiming that gas had been found in paying quantities? Appellant concedes that gas to the amount of about $500 was sold by the lessee from this well in December, 1922, and January and February, 1923. The burden of proof was upon the plaintiff to show that he was entitled to a cancellation of the lease, and therefore to show that gas was not being produced in paying quantities. Hennessy v. Junction Oil & Gas Co., 75 Okl. 220, 182 P. 666; Baird v. Atlas Oil Co., 146 La. 1091, 84 So. 366; Thornton on Oil & Gas (4th Ed.) § 889, B. No evidence was given as to the cost of production of this gas, and plaintiffs offered no other evidence than their personal opinions that this well was not "a paying one." The real issue was the opinion of the lessee, and whether that opinion was arrived at in good faith. On February 28th the gas ceased flowing into the pipe line, but on March 6th, when the drilling began to deepen the well, there was 300,000 feet of gas in the well. The lessee's superintendent testified that he then considered the well a paying proposition. The good faith of this conclusion is not overthrown by the mere opinions of the plaintiffs to the contrary; nor is it overthrown by the fact that there was no immediate market at that time for the gas, after the flow into the pipe line had ceased.

It was contended in Summerville v. Apollo Gas Co., 207 Pa. 334, 56 A. 876, above cited, that, "no matter how much gas was produced, it could not be said to be a 'paying quantity,' unless it was sold at a profit," and it was in answer to this contention that the court held in the quotation which has heretofore been made, that the lessee's inability to find a purchaser of the gas was not the affair of the lessor. The delay from February 28th to May 24th, incident to drilling the well deeper, in marketing gas from the well, cannot be regarded as an abandonment of the well, nor as an unreasonable delay, as the lessor had been offered payment of the rental due him because of this well, and the year for which the rent had been paid had not expired. See Pennagrade Oil & Gas Co. v. Martin, 211 Ky. 137, 277 S. W. 302.

Upon the facts which have been stated, the lessee's judgment must be accepted as arrived at in good faith and on sufficient grounds. Having properly exercised its judgment in deciding that the well was producing gas in paying quantities, was the lessee's right to continue in possession lost by its drilling the well deeper? It still was possible for the lessee, if the deeper drilling should disclose no oil nor gas, to return to the stratum in which the gas had been found,

and to utilize that production. By the deeper drilling it undertook to secure a greater flow of gas or oil, which would be to the advantage of both parties to the lease. In the case of Roach v. Junction Oil & Gas Co., supra, 72 Okl. 213, 179 P. 934, gas had been found within the five-year term of the lease, but drilling was continued and after the term a greater flow of gas was found, and the claim was made that the drilling after the term has expired was ineffective to continue the lease. The court said:

"It is apparent that, if January 9th be taken as the correct date of the lease, gas in paying quantities and in sufficient quantities to transport was found before the expiration of five years. The fact that defendant cased off the gas found before January 9, 1916, and drilled deeper, shows no abandonment of these stratas of gas, because it appears that it was defendant's intention to return and utilize the gas found in the upper sands if nothing should be found at 2,600 feet. A case squarely in point is Eastern Oil Co. v. Coulehan et al., 65 W. Va. 531, 64 S. E. 836, where prior to the expiration of the lease gas was struck at a depth of 1,240 feet. After striking this gas the lessee concluded to go deeper, and a very short time after the expiration of the lease struck gas in paying quantities. It was there contended, as here, that, because the operator failed to utilize the gas found in the upper sand, the lease was abandoned, and the operator was not entitled to claim the benefit of the discovery in the lower sand. This contention was denied. The discovery of gas within the terms of the lease was held sufficient to vest the right thereafter to produce gas from the premises, which right it was said might be lost by abandonment, manifested by neglect to produce oil or gas or to pursue the work of production or further development. In the case before us, the defendant having discovered gas in at least three separate sands in quantities large enough to transport, what was to prevent it, if the lower sand should prove unprofitable, from returning to the upper sands, and from this well, or from other wells, tapping the upper sands and producing gas therefrom, as the evidence shows could have been done."

And in Parks v. Sinai Oil & Gas Co., 83 Okl. 295, 201 P. 517, a similar contention was answered by this statement:

" * * * If gas was produced in paying quantities within one year from the date of the lease, the defendant became vested with a limited estate in the leased premises for further operations in accordance with the terms of the lease, and such rights, once vested by the discovery of gas in the upper sand, was not lost by the lessee continuing to drill deeper in search of oil or gas in a lower sand, although he did not find oil or gas in the lower sand within the limitations prescribed by the lease. Roach v. Junction Oil & Gas Co. et al. [12 Okl. 213] 179 P. 934; Eastern Oil Co. v. Coulehan, 65 W. Va. 531, 64 S. E. 836. The evidence discloses that oil was found in the lower sand, and that the same is being produced, and, the defendant's interest having vested by reason of the discovery of gas in the upper sand, he is entitled to develop the land under the terms of said lease."

In the lease involved in this case, there was a provision which has been quoted, to the effect that failure by the lessee to use a gas producing well, which could not profitably be utilized at the rate prescribed by the lease, should not work a forfeiture of the lease so far as it related to mining oil, and if the lessee desired to retain gas producing privileges, the lessee should pay a rental of $100 per year on each gas-producing well, the gas from which was utilized. It also provided that the lessee might have the option of paying royalties on gas wells of small production, at the same rate per cent. of the gross proceeds as was paid as royalty for oil. It was further provided that the lessor could declare) the lease null and void, upon violation of any of the substantial terms and conditions of the lease, by giving 30 days' notice to the lessee. Reading these various provisions of the lease together, it is evident that the lease contemplated the possibility that a gas well might not produce a large volume of gas, and, instead of providing for a termination of the lease if such a well was found, there were special provisions for the continuance of the lease in force and for a reduction of the amount of rental. The policy of the lease is well defined in the provision for its forfeiture in case of a violation of its substantial terms, a policy that is consistent with the reluctance of courts of equity to enforce forfeitures when such a remedy is harsh and oppressive.

The evidence shows a substantial performance of the contract (Eastern Oil Co. v. Coulehan, 65 W. Va. 531, 64 S. E. 836), and the decree will be affirmed.