BREWSTER v. LANYON ZINC CO.

(Circuit Court of Appeals, Eighth Circuit. September 27, 1905.)

No. 2,184.

1. MINES AND MINERALS—OIL AND GAS LEASE—SUIT TO AVOID—INADEQUACY OF CONSIDERATION.

Mere inadequacy of consideration or other inequality in the terms of a lease does not in itself constitute a ground to avoid it in equity.

2. SAME—OPTION TO TERMINATE—TENANCY AT WILL.

A lease for a definite and permissible term, but which reserves to the lessee an option to terminate it before the expiration of the term does not create a mere tenancy at will within the operation of the rule that an estate at the will of one party is equally at the will of the other.

3. SAME—WANT OF MUTUALITY.

A lease given upon consideration of one dollar paid at the time is not wanting in mutuality merely because it reserves to one party an option to terminate it which it withholds from the other.

4. SAME—SEPARATE TRACTS INCLUDED IN ONE LEASE—EXPRESS STIPULATION FOR DEVELOPMENT.

An oil and gas lease on three separate tracts gave the lessee two years within which to drill "a well upon said premises," and provided that the time might be enlarged by the payment of an annual rental from the expiration of the second year "until said well is drilled," and that if "no well" should be drilled "upon said premises" within five years the lease should be void. Held, that the measure of diligence which the lessee was required to exercise in prosecuting the work of exploration and development during the first five years was expressly defined, and not left to the implication which otherwise might have arisen from the nature of the lease and the other stipulations therein, and that, a well having been drilled on one of the tracts during the fifth year and the stipulated rental having been paid from the end of the second year until that well was drilled, the lease was not avoidable merely because other wells were not drilled during the five year period.

5. SAME—SALE BY LESSOR OF PART OF LEASED LAND—SUBSEQUENT BREACH OF CONDITION.

A lessor who sells part of the leased land cannot enforce a forfeiture of the lease as to the land sold for a subsequent breach of condition. Quære, whether the condition, being entire, is apportioned or destroyed by the sale.

6. SAME—INTERPRETATION—IMPLICATION BUT ANOTHER NAME FOR INTENTION.

Whatever is implied in a lease is as effectual as what is expressed. Implication is but another name for intention, and if it arises from the language of the lease, when considered in its entirety, and is not gathered from the mere expectations of one or both of the parties, it is controlling.

7. SAME.

Whatever is necessary to the accomplishment of that which is expressly contracted to be done is part and parcel of the contract, though not specified.

8. SAME—LEASE CONSTRUED—IMPLIED COVENANT TO USE REASONABLE DILIGENCE IN DEVELOPMENT AND PRODUCTION.

A lease which grants "all the oil and gas" under the leased land, together with the right to enter "at all times" for the purpose of "drilling and operating," to erect and maintain structures, pipe lines, and machinery necessary for the "production and transportation" of oil and gas, and to use sufficient water, oil, and gas to run the necessary engines for the "prosecution of said business," which reserves to the lessor substantial royalties in kind and in money on the oil produced and saved and the gas used off the premises, which shows that the promise of these royalties

was the controlling inducement to the grant, and which, while expressly requiring the drilling of one well during the first five years, does not expressly define the measure of diligence to be exercised in the work of development and production after the expiration of that period, contains a covenant by the lessee, arising by necessary implication from the nature of the lease and the other stipulations therein, that if, during the five years allowed for original exploration and development oil and gas, one or both are found in paying quantities, the work of development and production shall be continued with reasonable diligence; that is, along such lines as will be reasonably calculated to make the extraction of oil and gas from the leased land of mutual advantage and profit to the lessor and the lessee.

9. SAME—COVENANT MADE A CONDITION.

Whether a covenant is also a condition is essentially a question of intention, and where in an oil and gas lease the covenants of the lessee are introduced with the statement that the grant is made "on the following terms," and are followed by a stipulation that the lessee's failure to comply with "any of the above conditions," shall render the lease null and void, this stipulation has reference to the spirit and legal effect, and not the mere letter, of what precedes, and if that by necessary implication contains a covenant by the lessee to exercise reasonable diligence in prosecuting the work of development and production, such covenant is also a condition, a plain and substantial breach of which, in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor and conjecture on the part of mining enthusiasts, will entitle the lessor to avoid the lease.

10. SAME—WHAT IS REASONABLE DILIGENCE—NEITHER PARTY IS ARBITER.

Where the object of the operations contemplated by an oil and gas lease is to obtain a benefit or profit for both lessor and lessee, neither is, in the absence of a stipulation to that effect, the arbiter of the extent to which or the diligence with which the operations shall proceed; but both are bound by the standard of what, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both.

11. SAME—EXERCISE OF REASONABLE DILIGENCE—FACTS—CONCLUSION.

An oil and gas lease contained a covenant, which was also made a condition, that the lessee would continue with reasonable diligence the work of development and production after the expiration of the period allowed for original exploration and development, if during that period oil and gas, one or both, were found in paying quantities. The lease covered two tracts, owned by the lessor, which were widely separated and embraced 232.50 acres. Both were within a recognized oil and gas field. These minerals were being produced in paying quantities from the lands surrounding each tract. Near the expiration of the period allowed for original exploration and development the lessee drilled a single well on one of the tracts, in which gas was found in paying quantity, and thereafter took and maintained the position that by drilling that well and paying the stipulated price for gas used therefrom it acquired the right to hold the lease indefinitely without further development. This situation continued for 14 months, when the lessor elected to terminate the lease for breach of the covenant and condition for the exercise of reasonable diligence. *Held,* that in these circumstances the prolonged failure of the lessee to continue the work of development and production, though due to a mistaken view of the obligations imposed by the lease, was a plain and substantial breach of the covenant and condition and entitled the lessor to terminate the lease.

12. EQUITY—RELIEF IN EQUITY—REMEDY AT LAW.

A remedy at law is not adequate, in the sense that it will deprive a court of equity of jurisdiction, unless it is as certain, prompt, and efficient to the ends of justice as the remedy in equity.

**13. SAME—RELIEF IN EQUITY AGAINST FORFEITURE OF LEASES.**

Equity will not relieve against a breach of condition, in respect of a leasehold, where the elements of fraud, accident, and mistake are wanting and the measure of compensation is uncertain, but will allow the forfeiture to be enforced, if such is the remedy provided by the contract.

**14. SAME—ENFORCEMENT OF FORFEITURES IN EQUITY—GENERALLY REFUSED, BUT RULE NOT INFLEXIBLE.**

Because forfeitures are usually harsh and oppressive, and because they can ordinarily be enforced at law, courts of equity generally refuse to aid in their enforcement; but the rule is not absolute or inflexible. Its influence and operation do not extend beyond the reasons which underlie it, and in cases, otherwise cognizable in equity, there is no insuperable objection to the enforcement of a forfeiture in a court of equity when that is more consonant with the principles of right, justice, and morality, than to withhold equitable relief.

**15. SAME—WHEN SUIT IS ONE TO ENFORCE FORFEITURE.**

A suit, the primary and only purpose of which is to establish a forfeiture as matter of record and to cancel the thing forfeited—in this instance a lease—is a suit to give effect to, and therefore to aid in, the enforcement of a forfeiture, and the equity which it presents must be strong enough to overcome the general indisposition of courts of chancery towards granting such relief.

**16. MINES AND MINERALS—FACTS—DECISION.**

A forfeiture of an oil and gas lease was incurred under circumstances which do not entitle the lessee to relief in equity. Although actually terminated by the default of the lessee and the assertion of a forfeiture by the lessor, the lease appears, as spread upon the public records and is claimed by the lessee, to be still effective as a disposal of all the oil and gas in the lessor's land. It embarrasses, if it does not prevent, the exercise of the right to make other disposition of these minerals, and this at a time when they are being exhausted by the lawful multiplication and operation of wells on surrounding lands. The lessor is in possession, save of a small portion of the land occupied by the lessee in the operation of a single gas well which it has drilled. The state statute permits the defeated party in ejectment to demand and obtain a second trial as matter of right. *Held*, that a bill disclosing these facts states a case which calls for a measure of relief not attainable at law, and which entitles the lessor to a decree giving effect to the forfeiture by its establishment as matter of record and by the cancellation of the lease as a cloud upon the title.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the District of Kansas.

This was a suit in equity to establish, as matter of record, the forfeiture of an oil and gas lease and to cancel the same as a cloud upon complainant's title. The suit was commenced December 31, 1901, in the district court of Allen county, Kan., and was removed into the Circuit Court on defendant's petition. To an amended bill filed February 20, 1904, defendant demurred, assigning as causes therefor want of equity in the bill and the existence of a full, complete, and adequate remedy at law. The demurrer was sustained, and, as complainant declined to amend, a decree was entered dismissing the bill. Complainant appeals. The facts stated in the amended bill are these:

The lease was made by complainant to the Palmer Oil & Gas Company, October 28, 1895, and is as follows:

"In consideration of the sum of one dollar, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained, M. L. Brewster (Widow), first party, hereby grants unto the Palmer Oil & Gas Company of Fostoria, Ohio, second party, successors and assigns, all the oil and gas under the following described premises, together with the right to enter thereon at all times for the purpose of drilling and operating for oil, gas, or water, to erect, maintain, and remove all buildings, structures,

pipes, pipe lines, and machinery necessary for the production and transportation of oil, gas, and water: Provided, that the first party shall have the right to use said premises for farming purposes except such part as is actually occupied by second party, namely, a lot of land situated in the township of Iola and Elm, county of Allen, in the state of Kansas and described as follows, to wit: N. ½ of N. W. ¼ of section 2—25—18; also S. ½ of S. E. ¼ of section 5—25—19, less 7½ acres off the west end; also S. W. ¼ of section 21—24—19 section number 2—5—21—township number 25—24, range number 18—19, containing three hundred and twelve and $50/100$ acres more or less.

"The above grant was made on the following terms: (1) Second party agrees to drill a well upon said premises within two years from this date, or thereafter pay to first party seventy-eight dollars annually until said well is drilled, or the property hereby granted is conveyed to the first party. · (2) Should oil be found in paying quantities upon the premises second party agrees to deliver to first party in tank or in the pipe line with which it may connect the well or wells the one-tenth part of all the oil produced and saved from said premises. (3) Should gas be found, the second party agrees to pay first party fifty dollars annually for every well from which gas is used off the premises. (4) The first party shall be entitled to enough gas free of cost for domestic use in the residence on said premises as long as second party shall use gas off said premises under this contract, but shall lay and maintain the service pipes at his own expense and use the gas at his own risk. The said party of the second part further to have the privilege of excavating for water and of using sufficient water, gas, and oil from the premises herein leased to run the necessary engines for the prosecution of said business. (5) Second party shall bury, when requested so to do by the first party, all gas lines used to conduct gas off said premises, and pay all damages to timber and crops by reason of drilling or the burying, repairing, or removal of lines of pipe over the said premises. (6) No well shall be drilled nearer than three hundred feet to any building on said premises, nor occupy more than one acre. (7) Second party may at any time remove all his property and reconvey the premises hereby granted, and thereupon this instrument shall be null and void. (8) A deposit to the credit of lessor in the Bank of Allen County, to the account of any of the money payments herein provided for shall be a payment under the terms of this lease. (9) If no well shall be drilled upon said premises within five years from this date, second party agrees to reconvey, and thereupon this instrument shall be null and void. (10) A failure of second party to comply with any of the above conditions renders this lease null and void."

The lease was assigned in February, 1899, to Thomas L. Hughes, and he, in March following, assigned it to defendant. It covered three separate and distinct tracts. In June, 1899, complainant sold and conveyed the tract in section 2 to one Holmes, who in July following sold and conveyed it to the Iola Portland Cement Company, which is not a party to the suit. Complainant continues to own the tracts in sections 5 and 21, and has actual possession thereof, save as defendant may have such occupancy of a portion· of the tract in section 5 as is incident to the operation of the gas well thereon. No well was drilled during the first four years after the date of the lease, but the stipulated sum of $78 was paid to complainant during each of the third and fourth years. In August, 1900, during the fifth year, a well was drilled on the tract in section 5 from which gas was obtained in paying quantity. Gas from this well has ever since been used off the premises by defendant in its business of smelting and refining ores. When the suit was commenced, which was 14 months after the expiration of the 5-year period and 16 months after the drilling of the single well, nothing more had been done by defendant in compliance with the terms of the lease, express or implied, save that the required annual payment of $50 for the gas so used off the premises may have been made—a matter in respect of which the bill is uncertain. Many oil and gas wells have been drilled in the territory adjacent to and surrounding the tracts leased, which furnish oil and gas in paying quantities, and new wells are being drilled and operated in that territory. These wells are so near to the tracts leased as to drain the same of a good portion of the

oil and gas therein, and therefore they render the lease of much less value to complainant than it would have been had defendant proceeded with reasonable diligence to drill other wells and to operate the same for the mutual benefit of the parties. The extent of this drainage is not susceptible of reasonable ascertainment, and therefore the consequent injury to complainant cannot be adequately compensated in damages. Defendant has at all times insisted, and still insists, that by drilling the single well it acquired the right to all the oil and gas in the leased tracts, and also the right to hold the lease indefinitely, without further development or doing more than paying annually $50 for the gas from that well used off the premises. It has been and is defendant's purpose to hold the lease either for speculative purposes or to prevent the oil and gas from being used by its rivals in business. Seven days before the commencement of the suit complainant notified defendant in writing that she elected to declare the lease terminated, null, and void, and demanded a surrender and cancellation of the same, but the demand was not complied with. As matter of convenience the defendant will generally be spoken of as the lessee, although it is in fact an assignee.

Baxter D. McClain, Travis Morse, L. W. Keplinger, and C. W. Trickett, for appellant.

Altes H Campbell, Chas. E. Benton, and John F. Goshorn, for appellee.

Before VAN DEVANTER, HOOK, and ADAMS, Circuit Judges.

VAN DEVANTER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Before considering the principal questions arising on this appeal, attention will be given to some matters set forth in the bill and not mentioned in the foregoing statement. One of these is an allegation to the effect that the lease was fraudulently procured, because in the negotiations which resulted in its execution the complainant was represented by an agent who was also, and without complainant's knowledge, acting as the agent of the lessee. Referring to this, counsel for the complainant say in their brief:

"No reflection is intended. We know him [the agent] to be a strictly honorable man, and we believe complainant's rights were fully protected."

This is a practical withdrawal of the charge of fraud; but, if counsel's concession were not so intended, the charge did not constitute a ground for avoiding the lease six years after its execution, almost three years after its assignment to a third person not claimed to have been cognizant of the fraud, more than one year after the assignee, relying on the validity of the lease, had made large expenditures in developing gas on the premises in paying quantity, and two years or more after the complainant had accepted from the lessee and the assignee, respectively, substantial payments, made according to the requirements of the lease, which she did not offer to return or attempt to excuse herself from returning.

It is also alleged that no gas has been furnished for domestic use in the residence on the premises. But this does not show that any right of the lessor has been denied or any obligation of the lessee broken. The lease in terms entitled the lessor to use the gas for domestic purposes, only on condition that she should lay and maintain the requisite service pipes to conduct the gas from the gas well or the pipes of the

lessee to such residence, and it is not alleged that she complied with the condition.

Other allegations are to the effect that the lease was without consideration, save the payment of $1, which, though technically valuable, was merely nominal, and that its terms were altogether unconscionable. These allegations, even if not withdrawn by counsel's concession that "complainant's rights were fully protected," are essentially restrained by the provisions of the lease and by other allegations in the bill. The lease recites that it is made in consideration "of the covenants and agreements hereinafter contained," as well as of the $1 then paid, and this recital is followed by several covenants and agreements on the part of the lessee, the performance of which would be of substantial, if not great, benefit to the lessor, and would be at substantial, if not great, cost to the lessee. There is a further stipulation to the effect that the lessee's failure to comply with any of these covenants or agreements shall render the lease void. It appears from the bill that when the lease was made the development of oil and gas in that field was in its infancy. The field was practically undeveloped and its extent was unknown. Experience in other oil and gas fields had demonstrated that wells drilled in the vicinity of producing wells were not infrequently unproductive. The only method of certainly determining whether or not particular lands contained oil or gas in paying quantity was by drilling thereon to considerable depth. This was attended with great expense. The lease placed the hazard incident to the uncertainty of the undertaking on the lessee. It was to pay the entire expense and was to bear the loss if the undertaking resulted in failure. In these circumstances it cannot be said that the terms of the lease were unconscionable. But the allegations of inadequacy of consideration and of inequality in terms may be dismissed with a reference to the rule which controls a court of equity in such cases. It is stated by Story as follows (1 Equity Jurisprudence, § 244):

"Mere inadequacy of price or any other inequality in the bargain is not, however, to be understood as constituting, per se, a ground to avoid a bargain in equity. For courts of equity as well as courts of law act upon the ground that every person who is not from his peculiar condition or circumstances under such disability is entitled to dispose of his property in such manner and upon such terms as he chooses; and whether his bargains are wise and discreet, or profitable or unprofitable, or otherwise, are considerations, not for courts of justice, but for the party himself to deliberate upon."

And it was recognized in Marble Company v. Ripley, 10 Wall. 339, 356, 19 L. Ed. 955, where it was held:

"Nor is it any reason for rescinding the contract that it has become more burdensome in its operation upon the complainants than was anticipated. If it be, indeed, unequal now, if it has become unconscionable, that might possibly be a reason why a court should refuse to decree its specific performance; but it has nothing to do with the question whether it should be ordered to be canceled. It is not the province of a court of equity to undo a bargain because it is hard."

See, also, Lowther Oil Co. v. Guffey, 52 W. Va. 88, 91, 43 S. E. 101.

The position is taken in the bill that by reason of the clause which declares: "Second party [the lessee] may at any time remove all his property and reconvey the premises hereby granted, and thereupon this

instrument shall be null and void"—the lease was wanting in mutuality, was determinable at the will of the lessee, and was therefore equally determinable at the will of the lessor.    The position is not sound. Although the parties, with the sanction of a general practice, denominated the instrument a "lease," strictly speaking it was not such, but was more in the nature of a grant in præsenti of all the oil and gas in the lands described—these minerals being part of the realty—with the right to enter and search for them, and to mine and remove them when found.    Lanyon Zinc Co. v. Freeman (Kan.) 75 Pac. 995; Dickey v. Coffeyville Vitrified Brick & Tile Co. (Kan.) 76 Pac. 398. Because, however, of the designation given to the instrument by the parties, it is here spoken of and treated as a lease.    It runs to the lessee, its successors, and assigns, is without limitation as to time, and plainly shows that it is designed to be perpetual, if the oil or gas shall continue, and the lessee and those claiming under it shall fulfill its stipulations.    True, it was made and accepted upon certain conditions, one of which is that the premises may be reconveyed at any time at the option of the lessee; but that does not make the estate which it creates a mere tenancy at will within the operation of the common-law rule that an estate at the will of one party is equally at the will of the other.    That rule is without application to a lease for a defined and permissible term, but which reserves to the lessee an option to terminate it before the expiration of the term.    Archbold's Landlord and Tenant, 92; Dann v. Spurrier, 3 Bos. & Pul. 399; Doe v. Dixon, 9 East. 15.    The present lease is of this type.    It is essentially one in perpetuity.    Such a term is permissible in the state of Kansas, where the creation of leaseholds in real property is almost entirely a matter of contract between the parties.    Dickey v. Coffeyville Vitrified Brick & Tile Co., supra; Effinger v. Lewis, 32 Pa. 367.    The option reserved to the lessee was not designed to convert the estate, as otherwise defined, into a mere tenancy at will, or to make it determinable at any time at the option of the lessor.    The lease expresses the intention of the parties, and, no rule of law forbidding, that intention is controlling. The consideration of $1, the receipt of which was acknowledged, although small, was yet sufficient to make the lease effective and to support every stipulation in it favorable to the lessee, including the option to surrender it at any time.    Brown v. Fowler, 65 Ohio St. 507, 525, 63 N. E. 76; Gas Co. v. Eckert, 70 Ohio St. 127, 135, 71 N. E. 281; Davis v. Wells, 104 U. S. 159, 168, 26 L. Ed. 686; Allegheny Oil Co. v. Snyder, 45 C. C. A. 604, 608, 106 Fed. 764, 767.    Resting, therefore, upon an executed and valuable consideration, the lease was not wanting in mutuality merely because it reserved to one party an option which it withheld from the other.    Brown v. Fowler and Gas Co. v. Eckert, supra; 9 Cyc. 334.

The further position is taken in the bill that the lessor was entitled to avoid the lease, because it covers three tracts separated by distances of from 8 to 14 miles, and because no well was drilled on two of the tracts within five years.    That is a matter in respect of which it was competent for the parties to stipulate, and in respect of which they did stipulate, as shown by the following clauses of the lease:

"(1) Second party [the lessee] agrees to drill a well upon said premises within two years from this date, or thereafter pay to first party [the lessor] seventy-eight dollars annually until said well is drilled, or the property hereby granted is conveyed to the first party."

"(9) If no well shall be drilled upon said premises within five years from this date, second party agrees to reconvey, and thereupon this instrument shall be null and void."

The purpose and effect of these clauses was plainly (1) to give the lessee two years within which to drill a well (not three wells, but one) upon the leased premises—not each tract, but the entire premises; (2) to enlarge that time, but not beyond five years, on condition that the lessee should pay an annual rental of $78 from the expiration of the second year until the well should be drilled; and (3) to entitle the lessor to a reconveyance of the premises if no well—none at all—should be drilled thereon within five years. Thus the measure of diligence which the lessee was required to exercise in prosecuting the work of exploration and development during the first five years was expressly and definitely prescribed, and was not left to any implication which otherwise might arise from the nature of the lease or from the other stipulations therein. It is appropriate to here refer to what was well said by the Supreme Court of Kansas, in disposing of a somewhat similar question, in the case of Rose v. Lanyon Zinc Co., 68 Kan. 126, 74 Pac. 625:

"If plaintiffs should desire to contract for an immediate exploration, they must have that right; and if they should desire to give an oil or gas company five years in which to sink a well, upon a consideration satisfactory to themselves, and as the result of negotiations free from imposition and fraud, they must have that right. But, having deliberately made a contract of the latter description, they have no right to call upon a court to declare that it is of the other kind, merely because generally it might seem to be better for farmers not to incumber their lands with mineral leases, giving a long time for exploration, or because generally such leases do contemplate that forfeiture shall follow a failure to explore at once."

As it is admitted that a well producing gas in paying quantity was drilled on the leased premises during the fifth year and that the stipulated annual rental was paid from the end of the second year until the well was drilled, it follows that the prescribed measure of diligence was exercised, and the lease was not avoidable because other wells were not drilled during the five-year period. Monfort v. Lanyon Zinc Co., 67 Kan. 310, 72 Pac. 784.

The complainant has proceeded upon the assumption that a failure on the part of the lessee to comply with any condition of the lease entitles her to avoid it as to all of the three tracts embraced therein; but as she is shown by the bill to have long since parted with the ownership of one of the tracts, and as the present owner is not a party to the bill, it is obvious that no relief can be granted in respect of that tract. No reference is made by learned counsel for the appellee to the rule that, where the reversion in part of the demised lands is assigned, neither the lessor nor the assignee can take advantage of a condition broken, because the condition, being entire, is not apportioned by the assignment, but destroyed. Co. Litt. 215a; 1 Taylor's Landlord & Tenant (8th Ed.) § 296; 2 Wood's Landlord & Tenant (2d Ed.) § 512; Leake on Contracts (4th Ed.) 874; 2 Cruise on Real Property, tit.

13, c. 2, § 58; 1 Washburn on Real Property (5th Ed.) 508; 18 Am. & Eng. Enc. 393; Wright v. Burroughes, 3 C. B. 685; Twynam v. Pickard, 2 B. & Ald. 105. It is therefore assumed that the rule is not in force in the state of Kansas.

The questions arising on this appeal to which attention is chiefly given in the briefs are these: (1) Did the lessee expressly or impliedly covenant and agree to continue, with reasonable diligence, the work of exploration, development, and production after the expiration of the five-year period, if oil and gas, one or both, should be found in paying quantities? (2) Was compliance with this covenant and agreement made a condition, the breach of which would entitle the lessor to avoid the lease? (3) Is such a breach shown by the bill? (4) Is the lessor entitled to relief in equity?

It is conceded, as indeed it must be, that the lease contains no express stipulation as to what, if anything, should be done in the way of searching for and producing oil or gas after the first five years; but it does not follow from this that it is silent on the subject, or that the matter is left absolutely to the will of the lessee. Whatever is implied in a contract is as effectual as what is expressed. Implication is but another name for intention, and if it arises from the language of the contract when considered in its entirety, and is not gathered from the mere expectations of one or both of the parties, it is controlling. Light will be thrown upon the language used, and the intention of the parties will be better reflected, if consideration is given to the peculiar and distinctive features of the mineral deposits which are the subjects of the lease. Oil and gas are usually found in porous rock at considerable depth under the surface of the earth. Unlike coal, iron and other minerals, they do not have a fixed situs under a particular portion of the surface, but are capable of flowing from place to place and of being drawn off by wells penetrating their natural reservoir at any point. They are part of the land, and belong to the owner so long as they are in it, or are subject to his control; but when they flow elsewhere, or are brought within the control of another by being drawn off through wells drilled in other land, the title of the former owner is gone. So, also, when one owner of the surface overlying the common reservoir exercises his right to extract them, the supply as to which other owners of the surface must exercise their rights, if at all, is proportionally diminished. Lanyon Zinc Co. v. Freeman (Kan.) 75 Pac. 995; Brown v. Spilman, 155 U. S. 665, 669, 15 Sup. Ct. 245, 39 L. Ed. 304; Ohio Oil Co. v. Indiana (No. 1) 177 U. S. 190, 203-208, 20 Sup. Ct. 576, 44 L. Ed. 729; Acme Oil & Mining Co. v. Williams, 140 Cal. 681, 684, 74 Pac. 296.

Looking, then, to the present lease, it is seen that the real subject thereof was the oil and gas believed to be in or obtainable through the lessor's land, and the right to search for them and to reduce them to possession. The terms of the lease, material to the present inquiry, were in effect as follows: The consideration was primarily $1 paid at the time, but secondarily the covenants and agreements of the lessee. The grant was of "all the oil and gas" under the premises described, together with the right to enter "at all times" for the purpose of "drilling and operating," to erect and maintain structures, pipe

lines, and machinery necessary for the "production and transportation" of oil and gas, and to use sufficient water, oil, and gas to run the necessary engines for the "prosecution of said business." The grant was stated to be "on the following terms," and then followed several stipulations, among which were these express covenants and agreements on the part of the lessee: (1) To drill a well within two years, with a right to enlarge the time to five years by the payment of an annual rental of $78 from the end of the second year until a well should be drilled. (2) To drill no well nearer than 300 feet to any building on the premises, and to occupy not exceeding one acre of the surface in connection with any well. (3) "Should oil be found in paying quantities," to deliver to the lessor one-tenth of all the oil "produced and saved." (4) "Should gas be found," to pay to the lessor $50 annually for "every well" from which gas should be used off the premises. The concluding stipulation was that a failure on the part of the lessee to comply with "any of the above conditions" should render the lease null and void. The implication necessarily arising from these provisions—the intention which they obviously reflect—is that if, at the end of the five-year period prescribed for original exploration and development, oil and gas, one or both, had been found to exist in the demised premises in paying quantities, the work of exploration, development, and production should proceed with reasonable diligence for the common benefit of the parties, or the premises be surrendered to the lessor. That this was of the very essence of the contract is shown by the extensive character of the grant, which was without limit as to time and included all the oil and gas in or obtainable through the demised premises; by the provisions for the payment of substantial royalties in kind and in money on the oil produced and saved and the gas used off the premises, which, as contrasted with the consideration paid when the lease was executed, shows that the promise of these royalties was the controlling inducement to the grant; and by the provisions contemplating the drilling and operation of wells, the production and transportation of oil and gas, and the prosecution of that business subject to the restrictions prescribed.

Considering the migratory nature of oil and gas, and the danger of their being drawn off through wells on other lands if the field should become fully developed, all of which must have been in the minds of the parties, it is manifest that the terms of the lease contemplated action and diligence on the part of the lessee. There could not well have been an express stipulation as to the number of wells to be drilled, as to when the wells, other than the first, should be drilled, or as to the rate at which the production therefrom should proceed, because these matters would depend in large measure upon future conditions, which could not be anticipated with certainty, such as the extent to which oil and gas, one or both, could be produced from the premises, as indicated by the first well and any others in the vicinity, the existence of a local market or demand therefor or the means of transporting them to a market, and the presence of wells on adjacent lands capable of diminishing or exhausting the supply in the natural reservoir. The subject was, therefore, rationally left to the implication, necessarily arising in the absence of express stipulation, that the further prosecution of the work should

be along such lines as would be reasonably calculated to effectuate the controlling intention of the parties as manifested in the lease, which was to make the extraction of oil and gas from the premises of mutual advantage and profit. Even in respect of the first well, if oil or gas was found in paying quantity, there was no express engagement to operate it; but that it was intended to be operated was plainly implied in the engagement to pay royalties to be gauged according to the production of oil and the use of gas. Whatever is necessary to the accomplishment of that which is expressly contracted to be done is part and parcel of the contract, though not specified. Godkin v. Monahan, 27 C. C. A. 410, 415, 83 Fed. 116; Lawler v. Murphy, 58 Conn. 309, 20 Atl. 457, 8 L. R. A. 113; Savage v. Whitaker, 15 Me. 24; Currier v. Boston & Maine R. R., 34 N. H. 498, 510.

In Harris v. Ohio Oil Co., 57 Ohio St. 118, 127, 48 N. E. 502, 505, it was said by the Supreme Court of Ohio, in considering whether a similar lease contained an implied covenant for the drilling of a reasonable number of wells:

"On principle, it would seem that there is such implied covenant in the written instrument. When no time is fixed for the performance of a contract, a reasonable time is implied. When a contract for the erection of a house or other structure is silent as to the quality of the materials or workmanship, it is implied that the same should be of reasonable quality. In a lease of a farm for tillage on the shares, it is implied that the tenant shall cultivate the farm in the manner usually done by reasonably good farmers. So, under an oil lease which is silent as to the number of wells to be drilled, there is an implied covenant that the lessee shall reasonably develop the lands and reasonably protect the lines."

And the decisions in other states in which the question has arisen have been uniformly to the same effect. Allegheny Oil Co. v. Snyder, 45 C. C. A. 604, 106 Fed. 764; McKnight v. Manufacturers' Natural Gas Co., 146 Pa. 185, 199, 23 Atl. 164, 28 Am. St. Rep. 790; Kleppner v. Lemon, 176 Pa. 502, 35 Atl. 109; Koch's and Balliett's Appeal, 93 Pa. 434, 441; Aye v. Philadelphia Co., 193 Pa. 451, 44 Atl. 555; Acme Oil & Mining Co. v. Williams, 140 Cal. 681, 684, 74 Pac. 296; Gadbury v. Ohio & Indiana Consolidated Natural & Illuminating Gas Co. (Ind.) 67 N. E. 259, 62 L. R. A. 895; Consumers' Gas Trust Co. v. Littler (Ind.) 70 N. E. 363; Island Coal Co. v. Combs (Ind.) 53 N. E. 452, 455; Parish Fork Oil Co. v. Bridgewater Gas Co. (W. Va.) 42 S. E. 655, 59 L. R. A. 566; J. M. Guffey Petroleum Co. v. Oliver (Tex. Civ. App.) 79 S. W. 884; Conrad v. Morehead, 89 N. C. 31; Logan Natural Gas & Fuel Co. v. Great Southern Gas & Oil Co., 61 C. C. A. 359, 361, 126 Fed. 623; Kellar v. Craig, 61 C. C. A. 366, 369, 126 Fed. 630. See, also, United States v. Bostwick, 94 U. S. 53, 65, 24 L. Ed. 65; 2 Washburn on Real Property (5th Ed.) 12.

Upon both principle and authority it must be held that the present lease contains a covenant by the lessee to continue, with reasonable diligence, the work of exploration, development, and production at the end of the five years, if during that time oil and gas, one or both, are found in paying quantities. It does not militate against this conclusion that the lessee can at its option surrender the lease at any time, because until that is done the lessee is equally bound by all of its covenants, whether express or implied. The option does not entitle it to

do less than to entirely surrender the lease and to thereby enable the lessor to herself exercise the right to extract the oil and gas from her lands or to negotiate a new lease to that end.

The covenants of the lessee are introduced into the lease by the statement that the grant is made "on the following terms," and are followed by a stipulation that the lessee's failure to comply with "any of the above conditions" shall render the lease null and void. These provisions make it plain that it was the intention of the parties to make the covenants of the lessee conditions as well as covenants, and to reserve to the lessor the right to avoid the lease for the breach of any of them. But it is insisted that the words "any of the above conditions" refer to what is expressed, and not to what is implied, or, to state it differently, that they refer to the mere letter of the preceding stipulations and not to their spirit or legal effect. To so hold would be to declare the lease avoidable if the lessee fails to deliver one-tenth of all the oil produced and saved, or to pay the annual rental for gas used off the premises, but not avoidable if the lessee, having found oil and gas in paying quantities, ceases development and production, at a time when these fluids are being drawn off through wells on adjacent lands, and thereby jeopardizes the controlling object of the lease. And it would seem that to so hold might result in the lessor being practically without any remedy for the breach of the covenant for further development and production, inasmuch as specific performance cannot be had against one having an option to terminate the contract at any time (Marble Co. v. Ripley, 10 Wall. 339, 359, 19 L. Ed. 955; Express Co. v. Railroad Co., 99 U. S. 191, 200, 25 L. Ed. 319; Federal Oil Co. v. Western Oil Co., 57 C. C. A. 428, 121 Fed. 674; Rust v. Conrad [Mich.] 11 N. W. 265, 41 Am. Rep. 720), and as the obvious difficulty in establishing the amount of oil and gas in the demised premises, or the amount diverted therefrom by the wells on adjoining lands, would be a serious obstacle to the recovery of adequate damages at law. But, however this may be, the present insistence is not well grounded. The question is essentially one of intention (4 Kent's Com. *132; Doe v. Elsam, M. & M. 189; Faylor v. Brice, 7 Ind. App. 551, 34 N. E. 833), and the words "any of the above conditions" must be given effect in the sense in which they were used by the parties. They are very comprehensive, and were evidently designed to refer, not merely to the letter, but to the spirit and legal effect of the preceding stipulations, and therefore to every covenant of the lessee which is part of them. The error in the insistence to the contrary is that it fails to give effect to the well-established rule that a covenant arising by necessary implication is as much a part of the contract—is as effectually one of its terms—as if had been plainly expressed. United States v. Bostwick, 94 U. S. 53, 66, 24 L. Ed. 65; United States v. Babbitt, 1 Black, 55, 61, 17 L. Ed. 94; Bulkley v. United States, 19 Wall. 37, 40, 22 L. Ed. 62; Cornett v. Williams, 20 Wall. 226, 250, 22 L. Ed. 254; Hearne v. Marine Ins. Co., 20 Wall. 488, 493, 22 L. Ed. 395; Supervisors v. Lackawanna Iron, etc., Co., 93 U. S. 619, 624, 23 L. Ed. 989; Godkin v. Monahan, 27 C. C. A. 410, 415, 83 Fed. 116.

The conclusion is that compliance with the covenant to continue with reasonable diligence the work of exploration, development, and

production after the expiration of the five-year period, if during that time oil and gas, one or both, be found in paying quantities, is by the terms employed made a condition the breach of which entitles the lessor to avoid the lease.. In this view it becomes unnecessary to consider whether, if the covenant were not made a condition, its breach would constitute a ground for complete or partial forfeiture in equity—a matter in respect of which the courts have divided in opinion. What constitutes a breach of such a covenant has been the subject of consideration in several cases. McKnight v. Manufacturers' Natural Gas Co., 146 Pa. 185, 200–203, 23 Atl. 164, 28 Am. St. Rep. 790; Kleppner v. Lemon, 176 Pa. 502, 35 Atl. 109; Id., 198 Pa. 581, 48 Atl. 483; Colgan v. Forest Oil Co., 194 Pa. 234, 45 Atl. 119, 75 Am. St. Rep. 695; Koch's & Balliett's Appeal, 93 Pa. 434, 442; Harris v. Ohio Oil Co., 57 Ohio St. 118, 127, 48 N. E. 502; Coffinberry v. Sun Oil Co. (Ohio) 67 N. E. 1069; Gadbury v. Ohio & Indiana Consolidated Natural & Illuminating Gas Co. (Ind.) 67 N. E. 259, 62 L. R. A. 895; Kellar v. Craig, 61 C. C. A. 366, 369, 126 Fed. 630. The decisions have not been entirely harmonious, and well illustrate the difficulty of laying down any comprehensive rule in respect of a question which is so largely one of fact that it must be resolved in each case according to its particular circumstances. In some of the cases, notably Kellar v. Craig and Colgan v. Forest Oil Co., supra, it seems to be held that the question of what is reasonable in the way of continued exploration and development, where there is no specific stipulation on the subject, is committed to the judgment of the lessee, whose determination, if made honestly and in good faith, is conclusive, much as is the decision of an engineer under a construction contract which expressly makes him the final arbiter of all questions relating to the amount and character of the work done, its conformity to the contract, and the price to be paid. Guild v. Andrews (C. C. A.) 137 Fed. 369; Choctaw & Memphis R. R. Co. v. Newton (C. C. A.) 140 Fed. 225.

Thus it is said in Kellar v. Craig:

"In all leases for oil and gas purposes, a covenant to 'protect the lines' of and 'well develop' the land leased is implied by law, and so it follows that the general words relating to those matters, inserted in the lease under consideration, really add nothing to the obligations assumed by the lessee concerning such work. In such leases, where general covenants of that character are found or are implied, the lessee or his assigns are permitted to determine the character of the work to be done, and such ascertainment by him or them, in the absence of fraud, disposes of the question."

And in Colgan v. Forest Oil Co. it is said:

"So long as the lessee is acting in good faith on business judgment, he is not bound to take any other party's, but may stand on his own. Every man who invests his money and labor in a business does it on the confidence he has in being able to conduct it in his own way. No court has any power to impose a different judgment on him, however erroneous it may deem his to be. Its right to interfere does not arise until it has been shown clearly that he is not acting in good faith, on his business judgment, but fraudulently, with intent to obtain a dishonest advantage over the other party to the contract."

With great deference to the able courts which have adopted this view, we think it is not sound. In the absence of some stipulation to that effect, we think an oil and gas lease cannot be said to make the lessee

the arbiter of the extent to which, or the diligence with which, the exploration and development shall proceed. The operations contemplated, in the event oil and gas are found in paying quantities, are not to be likened unto a business into which one puts property, money, and labor exclusively his own, the profits and losses in which are of concern only to him, and the conduct of which may be according to his own judgment, however erroneous it may be. By reason of the conditions on which the lease is granted the lessor retains at least a contingent interest in the oil and gas, to the profitable extraction of which the operations are directed. This interest in the subject of the lease, and the fact that the substantial consideration for the grant lies in the provisions for the payment of royalties in kind and in money on the oil and gas extracted, make the extent to which and the diligence with which the operations are prosecuted of immediate concern to the lessor. If they do not proceed with reasonable diligence, and by reason thereof the oil and gas are diminished or exhausted through the operation of wells on adjoining lands, the lessor loses, not only royalties to which he would otherwise be entitled, but also his contingent interest in the oil and gas which thus passes into the control of others. The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. This is the rule in respect of all other contracts where the time, mode, or quality of performance is not specified, and no reason is perceived why it should not be equally applicable to oil and gas leases. There can, therefore, be a breach of the covenant for the exercise of reasonable diligence, though the lessee be not guilty of fraud or bad faith.

But, while this is so, no breach can occur save where the absence of such diligence is both certain and substantial in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor and conjecture on the part of mining enthusiasts. The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required. Whether or not in any particular instance such diligence is exercised depends upon a variety of circumstances, such as the quantity of oil and gas capable of being produced from the premises, as indicated by prior exploration and development, the local market or demand therefor or the means of transporting them to market, the extent and results of the operations, if any, on adjacent lands, the character of the natural reservoir— whether such as to permit the drainage of a large area by each well— and the usages of the business. Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required.

A plain and substantial disregard of this requirement constitutes a breach of the covenant for the exercise of reasonable diligence, which, as before shown, is also made a condition of the lease under consideration.

As the amended bill discloses that there was no breach of any condition during the 5-year period, and as the lessor will not be permitted to complain that the work of exploration and development is not proceeded with during the pendency of a suit in which she is seeking to have it adjudged that the right to proceed therewith was terminated before the suit was begun, the question of the lessee's diligence has reference only to the 14 months intervening between the expiration of the 5-year period and the declaration of forfeiture made by the lessor a few days prior to the beginning of the suit. The circumstances out of which the right to avoid the lease are alleged to have arisen are these: The land covered by the lease and owned by the lessor, omitting the tract sold, consisted of two tracts, separated by a distance of 8 miles and embracing 232.50 acres. Both tracts were within a recognized oil and gas field. The lessee had drilled one well on one of the tracts in which gas was found in paying quantity. No additional wells were drilled or attempted to be drilled during the 14 months. Many wells had been drilled in the territory adjacent to and surrounding these tracts which produced oil and gas in paying quantities, and new wells were being drilled and operated in that territory. The wells on adjacent lands were so near to these tracts that they drained the same of a good portion of the oil and gas therein and rendered the lease of much less value to the lessor than it would have been had the lessee proceeded with reasonable diligence to drill other wells on the two tracts and to operate them for the mutual benefit of the parties. The lessee took and maintained the position that, by drilling the single well, it acquired the right to hold the lease indefinitely, without further development or doing more than paying annually the stipulated $50 for the gas from that well used off the premises. The extent of the drainage through wells on adjacent lands was not susceptible of definite ascertainment, and therefore the injury to the lessor from the lessee's failure to proceed with reasonable diligence could not be adequately compensated in damages. We think there can be no difference of opinion as to the effect of these allegations, all of which stand admitted by the demurrer. They show, not only an absence of reasonable diligence on the part of the lessee, but a practical repudiation of the controlling purpose of the lease and a persistent disregard of the rights of the lessor. The existence of gas in paying quantity in one of the tracts was an ascertained fact. Both oil and gas were being produced in paying quantities from the lands surrounding that tract and also from those surrounding the other. The consequent reduction of the underlying supply of these migratory minerals was operating to the serious disadvantage of the lessor. The necessary inference from what is stated is that further exploration and development would have been profitable to the lessee as well as beneficial to the lessor. In these circumstances the prolonged failure of the lessee to proceed with the contemplated operations, though due to a mistaken view of the obligations imposed by the lease, was a plain and substantial breach of the covenant and condition in respect of the ex-

ercise of reasonable diligence, and entitled the lessor to terminate the lease.

It is said the remedy of the lessor was not forfeiture, because the breach was compensable in damages. The claim is too broad. There is no general rule of law to that effect. Story's Equity Jurisprudence, §§ 1302, 1311. Relief against forfeitures is a distinctive doctrine of equity, and, save in special circumstances not shown to exist in this case, is never granted where the damages occasioned by the breach because of which the forfeiture is incurred cannot be ascertained with reasonable precision. Story's Equity Jurisprudence, §§ 450–454. Thus, in Sheets v. Selden, 7 Wall. 416, 421, 19 L. Ed. 166, where the forfeiture of a lease was under consideration, it was said:

"The grounds upon which a court of equity proceeds are that the rent is the object of the parties, and the forfeiture only an incident intended to secure its payment; that the measure of damages is fixed and certain; and that when the principal and interest are paid the compensation is complete. In respect to other covenants pertaining to leasehold estates, where the elements of fraud, accident, and mistake are wanting, and the measure of compensation is uncertain, equity will not interfere. · It allows the forfeiture to be enforced, if such is the remedy provided by the contract. This rule is applied to the covenant to repair, to insure, and not to assign."

The covenant here broken was not in the nature of a pecuniary obligation, such as a covenant to pay rent, nor was its breach reasonably compensable in damages. The amount of oil and gas which would have been produced from the lessor's land by the exercise of due diligence on the part of the lessee, as also the amount diverted therefrom by wells on surrounding lands, was not susceptible of anything like certain ascertainment. More than this, the attitude of the lessee was such that the breach promised to be a continuing one, and, by reason of the migratory character of oil and gas, to be as injurious to and as destructive of the lessor's rights as would be continuing trespass or waste. The forfeiture was, therefore, not one which equity would have relieved.

The forfeiture having been rightfully asserted under circumstances where the lessee was not entitled to relief in equity, the remaining question is: Can the lessor maintain a bill to establish the forfeiture as matter of record, and to cancel the lease as a cloud upon her title? It will be answered by considering whether "a plain, adequate, and complete remedy may be had at law." (Rev. St. § 723 [U. S. Comp. St. 1901, p. 583]), and also whether there is any insuperable objection in equity to granting relief which involves giving effect to a completed forfeiture. A remedy at law is not adequate, in the sense that it will deprive a court of equity of jurisdiction, unless it is as certain, prompt, and efficient to the ends of justice as the remedy in equity. Boyce's Ex'rs v. Grundy, 3 Pet. 210, 215, 7 L. Ed. 655; Kilbourn v. Sunderland, 130 U. S. 505, 514, 9 Sup. Ct. 594, 32 L. Ed. 1005; Gormley v. Clark, 134 U. S. 338, 349, 10 Sup. Ct. 554, 33 L. Ed. 909; Davis v. Wakelee, 156 U. S. 680, 688, 15 Sup. Ct. 555, 39 L. Ed. 578; Brown v. Arnold, 67 C. C. A. 125, 129, 131 Fed. 723; Williams v. Neeley, 67 C. C. A. 171, 180, 134 Fed. 1, 69 L. R. A. 232; Big Six Development Co. v. Mitchell (C. C. A.) 138 Fed. 279, 284.

The exigency of the case made by the amended bill is altogether un-

usual. Although actually terminated by the acts of the parties and no longer of any force or effect, the lease appears, as spread upon the public records, to be still effective as a disposal of all the oil and gas in the lessor's lands. It embarrasses, if it does not prevent, the exercise of the right to make other disposal of these minerals. This right is constantly and materially diminishing in value by reason of the multiplication and operation of wells on surrounding lands. These acts of the adjoining proprietors, being within their lawful rights, cannot be stayed by injunction pending an action at law against the lessee to establish the lessor's title. The lease is a cloud upon the title to the whole of both tracts. The lessor is in actual possession of both, save a small portion of one occupied by the lessee in the operation of the single gas well. No action at law can be had in respect of what is in the lessor's possession, and, while she can maintain ejectment in respect of what is occupied by the lessee, the judgment could not go beyond a determination of the title and right of possession to that particular portion. The statute of Kansas permits the defeated party in ejectment to demand and obtain a second trial as matter of right (Gen. St. 1901, § 5086), a circumstance which may well be considered where, as in the present case, unusual importance attaches to the promptness of the remedy. The mere statement of the situation shows that it is one which is in effect destructive of valuable property, is productive of irreparable injury, and calls for a measure of relief not attainable at law. United States Mining Co v. Lawson, 67 C. C. A. 587, 590, 134 Fed. 769; Empire State, etc., Co. v. Bunker Hill, etc., Co., 58 C. C. A. 311, 315, 121 Fed. 973; Big Six Development Co. v. Mitchell (C. C. A.) 138 Fed. 279; Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 449, 12 Sup. Ct. 239, 35 L. Ed. 1063; Sullivan v. Finnegan, 101 Mass. 447; Gormley v. Clark, 134 U. S. 338, 349, 10 Sup. Ct. 554, 33 L. Ed. 909. In the last case, the controlling purpose of which was to establish under a state statute the title to real property, the record of which had been destroyed by fire, there was included in the relief asked and granted a declaration that the complainant was entitled to the possession and a direction that one of the defendants claiming adversely surrender the possession to the complainant. Of this it was said by the Chief Justice in delivering an opinion affirming the decree:

"It is strenuously insisted that the remedy at law was adequate, and that, as the right of possession was a purely legal question and for a jury, the court of chancery should have declined jurisdiction; but, inasmuch as the case came within the provisions of the statute, and equity alone could afford the entire relief sought, the fact that legal questions were also involved could not oust the court of jurisdiction. The jurisdiction in equity attaches, unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would afford under the same circumstances."

The jurisdiction in equity in cases like this is sustainable on either of two well-recognized grounds, which are stated by Story as follows (Eq. Jur. §§ 705, 806):

"705. Cases also may occur where a deed or other instrument originally valid has by subsequent events, such as by a satisfaction or payment or other extinguishment of it, legal or equitable, become functus officio; and yet its existence may be either a cloud upon the title of the other party or subject

him to the danger of some future litigation when the facts are no longer capable of complete proof, or have become involved in the obscurities of time. Under such circumstances, although the deed or other instrument has become a nullity, yet courts of equity will interpose upon the like principles to prevent injustice, and will decree a delivery and cancellation of the instrument. This, indeed, is a very old head of equity, and traces of it are to be found in some of our earliest reports."

"806. * * * Cases of mines and collieries may also be mentioned, where courts of equity will entertain bills in the nature of bills quia timet and bills of peace, where there is danger that the mine may be ruined in the meantime before the right can be established; and upon such a bill the court will grant an adequate remedy by quieting the party in the enjoyment of his right, by restoring things to their old condition, and by establishing the right by a decree."

Another ground of jurisdiction in equity analogous to that first stated is illustrated by the case of Sharon v. Tucker, 144 U. S. 533, 547, 12 Sup. Ct. 720, 36 L. Ed. 532, which was a suit to establish as matter of record the title of the complainants growing out of adverse possession and to enjoin the assertion by the defendants of a title lost by such possession. It was said by Mr. Justice Field, after referring to several cases in which relief had been obtained in equity where the written evidence of title had been lost or destroyed:

"Many other authorities to the same purport might be cited. They are only illustrative of the remedies afforded by courts of equity to remove difficulties in the way of owners of property using and enjoying it fully, when, from causes beyond their control, such use and enjoyment are obstructed. The form of relief will always be adapted to the obstacles to be removed. The flexibility of decrees of a court of equity will enable it to meet every emergency. Here the embarrassments to the complainants in the use and enjoyment of their property are obvious and insuperable, except by relief through that court. No existing rights of the defendants will be impaired by granting what is prayed, and the rights of the complainants will be placed in a condition to be available. The same principle which leads a court of equity upon proper proof to establish by its decree the existence of a lost deed, and thus make it a matter of record, must justify it upon like proof to declare by its decree the validity of a title resting in the recollection of witnesses, and thus make the evidence of the title a matter of record."

Both because forfeitures are usually harsh and oppressive and because they can ordinarily be enforced at law, courts of equity generally refuse to aid in their enforcement. Horsburg v. Baker, 1 Pet. 232, 236, 7 L. Ed. 125; Marshall v. Vicksburg, 15 Wall. 146, 149, 21 L. Ed. 121; Jones v. Guaranty and Indemnity Co., 101 U. S. 622, 628, 25 L. Ed. 1030; Henderson v. Carbondale Coal & Coke Co., 140 U. S. 25, 33, 11 Sup. Ct. 691, 35 L. Ed. 332; Michigan Pipe Co. v. Fremont Ditch, etc., Co., 49 C. C. A. 324, 329, 111 Fed. 284; Foley v. Grand Hotel Co., 57 C. C. A. 629, 632, 121 Fed. 509. This has been at times declared to be an absolute and inflexible rule, as in Marshall v. Vicksburg, where it is said:

"Equity never, under any circumstances, lends its aid to enforce a forfeiture or penalty, or anything in the nature of either."

And at other times it has been stated with some qualification, as in Henderson v. Carbondale Coal & Coke Co., where it is said:

"Equity always leans against them, and only decrees in their favor when there is full, clear, and strict proof of a legal right thereto."

The better view is that the rule is not absolute or inflexible, any more than is every forfeiture harsh and oppressive; that its influence and operation do not extend beyond the reasons which underlie it; and that in cases, otherwise properly cognizable in equity, there is no insuperable objection to the enforcement of a forfeiture when that is more consonant with the principles of right, justice, and morality than to withhold equitable relief. As said by Story, Eq. Jur. § 439:

"The beautiful character or pervading excellence, if one may so say, of equity jurisprudence, is that it varies its adjustments and proportions so as to meet the very form and pressure of each particular case in all its complex habitudes."

In Brown v. Vandergrift, 80 Pa. 142, 148, a case involving the forfeiture of an oil lease, it was held by the Supreme Court of Pennsylvania:

"In a case like this equity follows the law, and will enforce the covenant of forfeiture, as essential to do justice. It is true as a general statement that equity abhors a forfeiture; but this is when it works a loss that is contrary to equity, not when it works equity and protects the landowner against the indifference and laches of the lessee and prevents a great mischief."

Other decisions to the same effect are Munroe v. Armstrong, 96 Pa. 307, 310; Mehaffey's Appeal, 4 Penny. (Pa.) 502; J. M. Guffey Petroleum Co. v. Oliver (Tex. Civ. App.) 79 S. W. 884, 888; Vicksburg & Meridian R. R. Co. v. Ragsdale, 54 Miss. 200; Kellar v. Craig, 61 C. C. A. 366, 126 Fed. 630; Kansas City Elevator Co. v. Union Pacific Ry. Co. (C. C.) 17 Fed. 200, 204; Gadbury v. Ohio & Indiana Consolidated, etc., Co. (Ind.) 67 N. E. 259, 261, 62 L. R. A. 895.

The last case involved the forfeiture of a gas lease, and it was held by the Supreme Court of Indiana:

"Forfeitures are usually against conscience and without equity, and it is for these reasons that courts of chancery ordinarily refuse relief in such cases; but an exception to the rule must exist where it be against equity to permit the defendant to longer assert his title. * * * The lack of any other remedy, and the danger that the gas might be withdrawn through wells on other lands, makes a case of this kind appeal to the conscience of the chancellor, and calls upon him to enforce the incurred forfeiture by removing the cloud from the title."

Decisions by the Supreme Court of Kansas are also in harmony with this view of the question. Thus, in Westbrook v. Schmaus, 51 Kan. 558, 33 Pac. 306, the forfeiture of a recorded contract for the sale of land was enforced by a decree canceling it as a cloud upon the title; and in Edwards v. Iola Gas Co., 65 Kan. 362, 69 Pac. 350, a like suit was entertained, and, though the relief sought was denied upon the ground that under the circumstances of that case the claimed forfeiture was not just or equitable, it was clearly indicated that under other circumstances the relief would have been granted. It follows from what has been said that, if the present case be regarded as in effect one to enforce a forfeiture, it is yet one the circumstances and exigency of which, as stated in the amended bill, entitle the lessor to relief in equity.

It has been said of a suit like this that it is not one to aid in the enforcement of a forfeiture. Harper v. Tidholm (Ill.) 40 N. E. 575; Mott v. Danville Seminary (Ill.) 21 N. E. 927; Pendill v. Union Mining Co. (Mich.) 31 N. W. 100. But we think it is essentially of that character.

Its primary and only purpose is to establish a forfeiture as matter of record and to obtain the cancellation of the thing forfeited. This constitutes enforcement in the only sense in which that term is applicable to a forfeiture, which is that of giving effect to it after its incurrence, just as a statute is enforced after its enactment. The case of Big Six Development Co. v. Mitchell (C. C. A.) 138 Fed. 279, which seems to adopt the other view, differs from this in that there the primary purpose was to enjoin continuing trespass or waste. It follows that, under the rule before stated, the lessor will be entitled to relief only in the event that the case made upon the hearing shall be, as is that made by the amended bill, one the equity of which is strong enough to overcome the general indisposition of courts of chancery towards aiding in the enforcement of forfeitures.

The decree is reversed, with instructions to overrule the demurrer to the amended bill and to take such further proceedings as may not be inconsistent with the views expressed in this opinion.